## Docket No. 25-7299

*In the*

# United States Court of Appeals

*For the*

# Ninth Circuit

———————◆———————

THE UPPER DECK COMPANY, a Nevada corporation,

*Plaintiff-Appellant,*

v.

RYAN MILTON, AKA Ryan Miller;
RAVENSBURGER NORTH AMERICA, INC., a Washington corporation,

*Defendants-Appellees.*

———————————————

*Appeal from a Decision of the United States District Court for the Western District of Washington,*
*No. 2:23-cv-01936-KKE · Honorable Kymberly K. Evanson*

## APPELLANT'S OPENING BRIEF

VINCENT LEVY, *Counsel of Record*
JACK L. MILLMAN
COLIN A. MARK
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Ave
New York, New York
(646) 837-5120
vlevy@hsgllp.com
jmillman@hsgllp.com
cmark@hsgllp.com

*Attorneys for Appellant The Upper Deck Company*

**Additional Counsel Listed On Inside Cover**

MARK P. WALTER
MITCHELL D. WEST
LOWE GRAHAM JONES, PLLC
1325 4th Avenue, Suite 1130
Seattle, Washington 98101
(206) 381-3300
walters@lowegrahamjones.com
west@lowegrahamjones.com

STEVEN W. FOGG
ERIC A. LINDBERG
CORR CRONIN, LLP
1015 Second Avenue, 10th Floor
Seattle, Washington 98104-1001
(206) 625-8600
sfogg@corrcronin.com
elindberg@corrcronin.com

MILES A. YANICK
YANICK LAW & DISPUTE RESOLUTION, PLLC
1325 4th Avenue, Suite 1130
Seattle, Washington 98101
(206) 455-5924
myanick@yanicklaw.com

CRAIG M. NICHOLAS
ALEX TOMASEVIC
SHAUN MARKLEY
NICHOLAS & TOMASEVIC, LLP
225 Broadway, 19th Floor
San Diego, California 92101
(619) 325-0492
cnicliolas@nicholaslaw.org
atomasevic@nicholaslaw.org
smarkley@nicholaslaw.org

*Attorneys for Appellant The Upper Deck Company*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Plaintiff-Appellant The Upper Deck Company ("Upper Deck") has no parent

corporation and no publicly held corporation owns 10% or more of its stock.

Date:  February 27, 2026

/s/ Vincent Levy
Vincent Levy
HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Ave
New York, New York
T: 646-837-5120
E: vlevy@hsgllp.com

# TABLE OF CONTENTS

INTRODUCTION ................................................................2

JURISDICTIONAL STATEMENT ................................................3

STATUTORY AUTHORITIES ...................................................4

ISSUES PRESENTED............................................................4

STATEMENT OF THE CASE ...................................................5

    A. Factual Background .....................................................5

        1. Miller develops the Miller Game for Upper Deck ...........................5

        2. Miller ends his relationship with Upper Deck and soon after develops for Ravensburger a substantially similar TCG .....................7

    B. Procedural Background.................................................9

        1. The court dismissed some claims with prejudice without finding Upper Deck lacked the ability to cure the pleading defects.................9

        2. Discovery revealed evidence of wrongdoing, including substantial similarities between the Miller Game and Lorcana. ...........................11

        3. The District Court finds a dispute of fact about Miller's breach but grants summary judgment on copyright and conversion anyway.......13

        4. Miller offers judgment..................................................14

SUMMARY OF THE ARGUMENT ..................................................14

ARGUMENT .....................................................................16

    I. The District Court erred in holding that Upper Deck could not amend its second amended complaint regarding UCL and trade secret claims. .16

    II. The Copyright Act protects the Miller Game's design.............................22

ii

A. Combinations of unprotected ideas can be protected expressions.23

B. The Miller Game contained a unique and expressive combination of elements that is subject to copyright protection. ...........................27

C. The District Court's analysis was erroneous. ................................29

III. Alternatively, if the Miller Game's combination of rules and mechanics is an idea, Ninth Circuit precedent holding the Copyright Act preempts state law claims based on ideas should be overruled. .........34

CONCLUSION ................................................................................37

APPENDIX A ................................................................................39

ADDENDUM

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Allen v. Acad. Games League of Am., Inc.*,
    89 F.3d 614 (9th Cir. 1996) ........................................................28

*Ambrosetti v. Oregon Catholic Press*,
    151 F.4th 1211 (9th Cir. 2025) ........... 3, 15, 16, 22, 23, 25, 26, 27, 28, 29, 30

*Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*,
    672 F.2d 607 (7th Cir. 1982) ........................................... 24, 26, 31

*Baker v. Selden*,
    101 U.S. 99 (1879) ................................................................. 24, 29

*Baxter v. MCA, Inc.*,
    812 F.2d 421 (9th Cir. 1987) ......................................................27

*Best Carpet Values, Inc. v. Google, LLC*,
    90 F.4th 962 (9th Cir. 2024) .......................................................35

*Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*,
    803 F.3d 1032 (9th Cir. 2015) ................................................. 24, 33

*BLOM Bank SAL v. Honickman*,
    605 U.S. 204 (2025) ..................................................................17

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
    973 P.2d 527 (Cal. 1999) ...........................................................17

*Cytodyn, Inc. v. Amerimmune Pharm., Inc.*,
    160 Cal. App. 4th 288 (2008) ......................................................19

*DJO Glob., Inc. v. Glader*,
    2016 WL 11622009 (S.D. Cal. Dec. 22, 2016) ...........................................17

*Dunlap v. G&L Holding Grp., Inc.*,
    381 F.3d 1285 (11th Cir. 2004) ...................................................36

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*,
    499 U.S. 340 (1991) ......................................................... 23, 24, 25

*Hanagami v. Epic Games, Inc.*,
    85 F.4th 931 (9th Cir. 2023) ............. 15, 16, 23, 24, 25, 26, 27, 28, 29, 30, 33

iv

*Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Industry of Southern California*,
   648 F.2d 1252 (9th Cir. 1981) ........................................................ 20

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*,
   978 F.3d 653 (9th Cir. 2020) .................................................... 19, 20

*Kansas v. Garcia*,
   589 U.S. 191 (2020) .............................................................. 16, 36

*Landsberg v. Scrabble Crossword Game Players, Inc.*,
   736 F.2d 485 (9th Cir. 1984) ......................................................... 31

*Marin-Torres v. Washington*,
   196 F. App'x 564 (9th Cir. 2006) .................................................... 21

*Montz v. Pilgrim Films & Television, Inc.*,
   649 F.3d 975 (9th Cir. 2011) .................................................... 34, 35

*Owens v. Kaiser Found. Health Plan, Inc.*,
   244 F.3d 708 (9th Cir. 2001) ................................................... 17, 18

*Polich v. Burlington N., Inc.*,
   942 F.2d 1467 (9th Cir. 1991) .............................................. 2, 17, 18

*Rubin v. Binary Arts Corp.*,
   1998 WL 917797 (N.D. Cal. Dec. 24, 1998) ............................................ 34

*Satava v. Lowry*,
   323 F.3d 805 (9th Cir. 2003) ........................................................ 27

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
   952 F.3d 1051 (9th Cir. 2020) ............................................. 3, 22, 24, 25

*teamLab Inc. v. Museum of Dream Space, LLC*,
   650 F. Supp. 3d 934 (C.D. Cal. 2023) ................................................ 34

*Tetris Holding, LLC v. Xio Interactive, Inc*,
   863 F. Supp. 2d 394 (2012) .......................................................... 31

*Twentieth Century-Fox Film Corp. v. MCA, Inc.*,
   715 F.2d 1327 (9th Cir. 1983) ....................................................... 22

*Williams v. Gaye*,
   895 F.3d 1106 (9th Cir. 2018) ....................................................... 29

**Statutes**

17 U.S.C. § 101 ...................................................................................24

17 U.S.C. § 102 ................................................................... 24, 32, 35

17 U.S.C. § 301 ...................................................................................35

18 U.S.C. § 1839 .................................................................................19

28 U.S.C. § 1291 ...................................................................................4

28 U.S.C. § 1331 ...................................................................................3

28 U.S.C. § 1332 ...................................................................................3

Cal. Bus. & Prof. Code §§ 1700–10 ...................................................9

Cal. Civ. Code § 3426 ................................................................. 19, 20

**Rules**

Fed. R. Civ. P. 15 .......................................................... 14, 15, 17

Fed. R. Civ. P. 68 ...............................................................................14

**Other Authorities**

3 Patry on Copyright § 4:45 ......................................................... 24, 33

C. Thi Nguyen, *Games: Agency as Art* (2020) ...................................26

Frank Lantz, *The Beauty of Games* (2023) .........................................26

*Magic: The Gathering* Comprehensive Rules (effective January 16, 2026),

    https://shorturl.at/51n2N .......................................................5

## INTRODUCTION

The District Court in this case held that a jury could find that a contractor ran off with a confidential, complex trading-card game and gave it to a competitor. But the court dismissed all claims against the competitor who stole it. This was error.

Plaintiff The Upper Deck Company hired Defendant Ryan Miller to develop a groundbreaking new trading-card game—a type of game where players buy cards, build decks, and play and trade with each other. The intellectual property would belong to Upper Deck, and Miller was bound by a written agreement to keep it secret. Miller developed a prototype game (the "Miller Game") for Upper Deck, but then took it with him to Ravensburger, a puzzle company that had never before released a trading-card game. At Ravensburger, Miller very quickly helped Ravensburger develop and release the company's first trading-card game. Not surprisingly, the game created for Ravensburger ("Lorcana") was extremely similar to the Miller Game. Upon discovering this theft, Upper Deck sued Miller and Ravensburger.

The District Court whittled away the case piece by piece until no claim remained against Ravensburger. At the pleading stage, the District Court dismissed claims premised on trade-secret misappropriation without granting leave to amend, despite recognizing that Upper Deck *could* plead such claims. Later, the District Court granted Ravensburger summary judgment on copyright claims, concluding that even if Ravensburger stole a unique combination of game mechanics from the

Miller Game, that combination could *never* be protected by the Copyright Act. At the same time, it dismissed Upper Deck's California conversion claim as preempted by the Copyright Act, citing controlling Circuit law. The court made all these rulings even though, at summary judgment, it held that a jury could find that Miller had misappropriated a confidential and valuable prototype and took it to Ravensburger.

This Court should reinstate the case against Ravensburger. *First*, the District Court should not have denied leave to add trade-secret misappropriation claims and theories at the pleading stage given that—as the District Court recognized—this would have cured the pleading defects it identified. Amendment is not futile "unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Polich v. Burlington N., Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991).[1] Here, the claim could have been saved by amendment, including by just adding statutory references, and the District Court never found otherwise.

*Second*, the district court erroneously dismissed Upper Deck's claim for copyright infringement by improperly narrowing it. As is settled, "a combination of unprotectable elements" is eligible for copyright protection when "those elements are numerous enough and their selection and arrangement original enough that their

---

[1] Unless otherwise noted, all internal quotation marks, citations, and alterations have been omitted from quotations.

2

combination constitutes an original work of authorship." *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1074 (9th Cir. 2020) (en banc). As a result, courts in this Circuit must evaluate whether the particular combination of unprotectible elements is itself expressive, and it is error to evaluate each unprotectible element individually. *Ambrosetti v. Oregon Catholic Press*, 151 F.4th 1211 (9th Cir. 2025). Yet that is exactly what the District Court did. It held the game prototype not subject to protection because it was a combination of elements, each of which unprotectible, without ever evaluating the combination. And the combination is subject to protection as an original work of authorship.

*Finally*, the District Court held that even though Upper Deck's combination of game mechanics was uncopyrightable, the Copyright Act nevertheless preempted Upper Deck's conversion claim. Although that conclusion follows from binding precedent, Upper Deck respectfully disagrees with that precedent—which splits with the Eleventh Circuit—and preserves its right to challenge it in later proceedings should this Court affirm the dismissal of the copyright claim.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1332(a). On October 3, 2025, the district court granted summary judgment to Defendants on all remaining claims except Upper Deck's breach of contract claim against Miller. 1-ER-32. On October 23, Upper Deck accepted an offer of final judgment against

3

Miller on the contract claim, 2-ER-55, and the District Court entered final judgment, which it confirmed covered all claims and parties, 1-ER-3–5. Upper Deck timely appealed on November 18. 3-ER-571–73. This court has jurisdiction under 28 U.S.C. § 1291.

## STATUTORY AUTHORITIES

Relevant authorities appear in the Addendum.

## ISSUES PRESENTED

I.     Whether the District Court erred in denying Upper Deck leave to amend its complaint on the ground of futility, after dismissing Upper Deck's unfair-competition claim due to the complaint not separately alleging trade-secret misappropriation, where the court failed to determine that Upper Deck lacked the ability to plead a misappropriation claim, and indeed Upper Deck could plead a trade-secret misappropriation claim and an unfair-competition claim predicated upon it.

II.     Whether the District Court erred in finding as a matter of law on summary judgment that a game designer's selection and arrangement of numerous game mechanics is never subject to protection under the Copyright Act, without ever analyzing whether the combination was itself an original work of authorship, and evidence shows it intentionally created a unique aesthetic experience for gameplayers.

4

III.    Alternatively, whether this Court should revisit its holding that the Copyright Act preempts state-law claims covering property not protected under the Act.

## STATEMENT OF THE CASE

### A. Factual Background

#### 1. Miller develops the Miller Game for Upper Deck.

A trading-card game (or "TCG") is a popular type of tabletop card game built on collectible cards that players can trade. 2-ER-84; 2-ER-143. A TCG typically features cards with unique abilities, characters, or attributes that players can build decks out of to "battle" each other. *Id.* The "canonical example of a TCG" is "Magic: The Gathering," a complex card game produced in 1993 that has many features found in later TCGs, such as a "process by which players use cards to work toward a goal" and a "means of regulating the flow of play such that the game builds from a start to a conclusion." 2-ER-143–44. Magic now features a unique combination of rules and game mechanics that run hundreds of pages. *See Magic: The Gathering* Comprehensive Rules (effective January 16, 2026), https://shorturl.at/51n2N. TCGs are a sensation: in 2024, the global TCG market was valued at approximately $4.3 billion. 2-ER-84–85.

In 2018, Upper Deck—a longtime leader in the trading-card industry—set out to create a new, innovative trading-card game. To that end, it entered into an

5

agreement with Ryan Miller for him "to contribute to the design and creation of new games." 1-ER-7. Thereafter, Upper Deck entered into a work-for-hire agreement for Miller to spearhead development of a new TCG. *Id.* Per that agreement, Miller agreed to "create the initial theme of [the game], develop basic game mechanics, provide a single player demonstration deck with between 20–30 cards to convey the Product's design, and to use his best efforts to contribute ideas, concepts, designs, and feedback related to the design, mechanics, and creation of the products[.]" *Id.*

Upper Deck retained all rights to Miller's work, with Miller specifically agreeing that "'[a]ll rights, title, and interest' in any '… specifications, drawings, designs, … property and materials produced or acquired by or for [Miller]' as part of his design work for Upper Deck belonged solely to Upper Deck." 1-ER-7–8. The agreement also required Miller to keep his work secret; "for two years following termination or expiration of the contract," Miller could not disclose "to 'any third party'" Upper Deck's non-public "confidential information," including non-public information about Upper Deck's "intellectual property (whether or not issued)," "products, releases, investments, … technologies, and techniques." 1-ER-8. As the District Court held on summary judgment, that covered Miller's work product.

In March 2020, Miller delivered to Upper Deck Version 2.6 of the game (the "Miller Game"), a prototype of what Upper Deck would later release under the title "Rush of Ikorr." 1-ER-9–10. Version 2.6 included two pages of instructions and

"three card decks consisting of approximately 100 cards." 1-ER-9. These comprised an "entire set of rules and card layouts" that built a "non-public combination of game mechanics" on top of a "unique … concept" called "Overlay[s]." 1-ER-24–25. Miller also completed other game-related work by October 2020. 1-ER-9. As Upper Deck's expert explained, the work product that Miller delivered was "a coherent, playable game" and a "substantially complete creative work." 2-ER-176–81.

### 2. Miller ends his relationship with Upper Deck and soon after develops for Ravensburger a substantially similar TCG.

In October 2020, Miller informed Upper Deck that he wanted to terminate his 2019 agreement and end the relationship with Upper Deck so that he could work full-time at Ravensburger. 1-ER-9. Unknown to Upper Deck, in September 2020, Miller had already begun to work on a competing TCG for Ravensburger that later became Lorcana. 1-ER-8; *see* 2-ER-120. With Upper Deck none the wiser, Miller finished his work at Upper Deck in early November and started full-time work on Lorcana soon after. 1-ER-9.

As the District Court concluded on summary judgment, "a reasonable jury could find that Miller disclosed 'Confidential Information' about Version 2.6" to Ravensburger when he went to work there. *See* 1-ER-25. For instance, Miller "discussed the unique 'Overlay' concept" from the Miller Game "with Steve Warner," a Ravensburger designer, "while Warner was working on Lorcana." 1-ER-25; *see* 3-

7

ER-422–23. Miller also retained "a copy of the Version 2.6 rules, as well as digital copies of the cards, while he helped develop Lorcana" at Ravensburger. 1-ER-25. And after Miller joined the Lorcana project fulltime, Ravensburger pivoted: Lorcana "bec[a]m[e] more like Rush of Ikorr." 1-ER-25.

Ravensburger publicly announced Lorcana in the fall of 2022 and published the initial ruleset in the spring of 2023. 1-ER-9. While the game did not provide many details when first announced, once Upper Deck learned about Lorcana, it realized Lorcana's ruleset was nearly identical to the Miller Game's. 3-ER-474.

On June 7, 2023, Upper Deck filed a lawsuit against Ravensburger and Miller in California state court. 2-ER-49–50. Upper Deck stated publicly at the time that: "We take pride in the creative choices made to design and develop our games, collectibles and memorabilia. We are suing Ravensburger and a previous Upper Deck game designer who have stolen and copied an original game we developed to repackage and market as Lorcana." 2-ER-54. In addition, Upper Deck stated that, after discovering "the upcoming Lorcana trading card game from Ravensburger mirrors game mechanics designed exclusively for Upper Deck by the same designer, we have filed a complaint as a means to protect our intellectual property." *Id.*

Around this same time, Upper Deck filed two copyright registrations for components of Rush of Ikorr—its "text" and "2-D artwork"—for both Version 2.6 and the 2023 version of the game. 1-ER-9; *see* 3-ER-460–61. Upper Deck continued

developing Rush of Ikorr and released it in June 2025, but the damage was done. 1-ER-9. Upon Rush of Ikorr's release, one TCG commentator remarked that the game "really" is "just Lorcana." 1-ER-10 n.3.

### B. Procedural Background

Upper Deck's initial complaint raised various claims, including breach of contract and fraud against Miller, tortious interference against Ravensburger, and conversion and violations of California's unfair competition law (Cal. Bus. & Prof. Code §§ 17200–10 ("UCL")) against both defendants. 3-ER-535–42. In July 2023, defendants removed Upper Deck's lawsuit to federal court, and Upper Deck then amended its complaint to add copyright claims. 3-ER-513; DE 12. As the District Court eventually held, the discovery record would permit a jury to find that Miller breached his contract and gave Ravensburger confidential information about the Miller Game. The District Court did not challenge the allegations and evidence that Lorcana copied a unique combination of game mechanics from the Miller Game, but dismissed all claims against Ravensburger.

### 1. The court dismissed some claims with prejudice without finding Upper Deck lacked the ability to cure the pleading defects.

Defendants moved to dismiss most claims in the First Amended Complaint (they did not seek to dismiss the breach of contract claim). 3-ER-492. The court sustained Upper Deck's copyright infringement claims and conversion claims that were "pled in the alternative." 3-ER-507–09. On the copyright claims, the court

9

noted "game rules and other mechanics are not protected" but declined to "decide whether or not" a combination of game mechanics was "protected under copyright law" given the claims could be sustained on other grounds. 3-ER-507 n.7. The court dismissed the remaining claims while mostly permitting leave to amend.[2] 3-ER-510–11.

Upper Deck then filed its Second Amended Complaint (the "SAC"). 3-ER-469–91. The SAC alleged that Miller and Ravensburger engaged in "premeditated theft" of Upper Deck's "proprietary" and "confidential" "intellectual property" in developing Lorcana. 3-ER-470, 3-ER-473, 3-ER-479. Although the SAC was drafted when "the entire Lorcana product [wa]s not yet publicly available," 3-ER-487–88, Upper Deck identified multiple announced features in Lorcana that duplicated unique and proprietary features of the Miller Game. *See* 3-ER-488 (comparison chart of "unique and expressive game effects" from Rush of Ikorr and equivalents in Lorcana).

Defendants again moved to dismiss. 1-ER-33, 1-ER-38. Upper Deck opposed and requested that, if the court dismissed any of its claims, then Upper Deck should be permitted leave to amend. 3-ER-468. As relevant here, the District Court

---

[2] The court dismissed with prejudice Upper Deck's breach of fiduciary duty and conversion claims against Miller based on the economic loss rule. DE 58 at 9, 17.

dismissed Upper Deck's UCL claim. The court explained that a trade-secret misappropriation claim could support a UCL claim, but dismissed the claim because it held that "[t]here is no trade secret misappropriation claim here." 1-ER-44–45. And although the court identified no other defect in the UCL claim and never evaluated whether Upper Deck could plead trade-secret misappropriation as a stand-alone or supporting claim, the court held that "leave to amend would be futile" because "Upper Deck's legal theory is flawed." 1-ER-45.

### 2. Discovery revealed evidence of wrongdoing, including substantial similarities between the Miller Game and Lorcana.

The surviving claims proceeded through discovery. Upper Deck received evidence that Ravensburger had access to confidential information about the Miller Game through Miller. For instance, evidence showed that Miller had access to Upper Deck's confidential information and that "he maintained a copy of the Version 2.6 rules, as well as digital copies of the cards, while he helped develop Lorcana," even though "such material [was] 'property' of Upper Deck." 1-ER-25. Evidence also indicated that "he discussed the unique 'Overlay' concept from Rush of Ikorr with Steve Warner while Warner was working on Lorcana" and that Lorcana became more like the Miller Game "after Miller joined Ravensburger." 1-ER-24–25.

In addition, significant evidence existed that Lorcana was "really just" the Miller Game. 1-ER-10 n.3. When Miller stopped working for Upper Deck, the Miller Game existed as a substantially complete prototype (Version 2.6) supplemented by

11

"some things that weren't written in" the prototype, because, per Miller's testimony, "[t]hey were … kind of understood." 2-ER-103; *see* 2-ER-224.

Evidence showed that in Lorcana, Miller and Ravensburger duplicated a unique combination of 43 Miller Game elements, *see* Appendix A, including key elements. 2-ER-162–63. Indeed, as Upper Deck's expert Dr. Bogost opined, Lorcana copied the "central bundle of expression [that] sits at the heart of the Miller Game as a creative work," meaning that both games had the same "distinctive aesthetic experience when played." 2-ER-163. Dr. Bogost explained how both games "invite[] a slow ramp of resources that the player can rely on; a sense of tension between attacking/defending and raiding in order to win; a way to exempt selected cards from risk in order to develop or carry out tactics; and a means of optionally modifying cards in order to vary them." *Id.* He also opined that "[t]hose similarities are not incidental"; rather they "constitute sufficient overlap as a bundle of particular expressions of abstract ideas found in TCGs to make the games fundamentally identical in nature, if different in appearance or theme." 2-ER-159.

Similarly, Upper Deck's expert Bubby Johanson opined: "the feel and flow of gameplay in both titles are so alike" that "the overlap cannot be dismissed as mere industry convergence or parallel design"; "what Lorcana copies is not one-off elements alone, but their specific combination and how they function together in the system that Miller helped design before his departure." 2-ER-226.

12

### 3. The District Court finds a dispute of fact about Miller's breach but grants summary judgment on copyright and conversion anyway.

After the close of discovery, Defendants moved for summary judgment on all claims. As noted, the court denied this motion as to Upper Deck's breach of contract claim against Miller, finding "triable issues as to whether Miller disclosed 'Confidential Information,'" as defined by his contracts with Upper Deck. 1-ER-23–27.

But the District Court granted summary judgment on Upper Deck's copyright claims on a sweeping statement of law. Thus, the District Court rejected Upper Deck's claim on the theory that "bundles" of "unprotectable game mechanics that are standard in TCGs" are categorically "not protected by copyright law." 1-ER-19. The District Court notably did not exclude the opinions of Upper Deck's experts, 1-ER-32.

The court also granted summary judgment on Upper Deck's conversion claim against Ravensburger, pressed to preserve the issue for appeal, based on Upper Deck's concession that controlling Ninth Circuit law dictated its conversion claims were preempted by the Copyright Act, even if the bundle of Miller Game mechanics was an idea and thus not protected by the Act. *See* 1-ER-27.[3]

---

[3] The Court also granted summary judgment to Miller on the remaining fraud claims, concluding that discovery had not borne them out; and on a distinct UCL claim (not at issue here) that had taken as its predicate either conversion or fraud. 1-ER-27–32.

13

**4. Miller offers judgment.**

After summary judgment, Upper Deck moved for leave to amend the complaint to conform to the evidence pursuant to FRCP 15(b) and add trade secret claims and a UCL claim based on trade-secret misappropriation. DE 195. The court denied that motion on the basis it would be unduly prejudicial to Defendants given the parties were "less than a month away" from trial. DE 224 (10/15/25 Tr.) 25:2–26:17. Separately, the District Court denied Miller's motion to exclude Dr. Bogost. 2-ER-61.

Miller then offered Upper Deck a $39,000 judgment pursuant to Rule 68. 2-ER-58–59. Upper Deck accepted, and the District Court entered judgment. 1-ER-3–5.

## SUMMARY OF THE ARGUMENT

I. The District Court committed legal error in denying leave to add a trade-secret misappropriation claim. In dismissing Upper Deck's unfair-competition claim, the District Court held that Upper Deck would have a viable claim if it had pleaded misappropriation of a trade secret, but faulted Upper Deck for not including a separate trade-secret claim and alleging misappropriation of "confidential information more broadly." Rather than consider if Upper Deck could cure the defect by pleading and adding a trade-secret claim—as a predicate to the unfair-competition claim and/or as an adaptation of it—the district court declined leave to amend.

14

But under Rule 15's liberal amendment policy, leave to amend should not be denied as futile unless it is "clear" that a pleading cannot be cured. Here, the District Court itself proposed the cure: plead trade-secret misappropriation. And the SAC's allegations demonstrated that Upper Deck easily could have channeled its misappropriation case into the trade-secret framework. So it was not "clear" that amendment was futile. Just the opposite was true. Leave to amend should have been granted.

II. The District Court erred again by granting summary judgment dismissing Upper Deck's copyright claim. The court recognized that a jury could find, based on fact and expert testimony, that Miller and Ravensburger stole the Miller Game and reskinned it as Lorcana. But the court nevertheless held as a matter of law that Lorcana could not infringe the Miller Game, because the Miller Game amounted to a combination of individually unprotectible "ideas."

That is not the law. As this Court has instructed, an original selection and arrangement of otherwise unprotectible elements, as in a song or in a dance routine, can be copyrightable and receive protection from copyright infringement. *Hanagami v. Epic Games, Inc.*, 85 F.4th 931 (9th Cir. 2023); *Ambrosetti v. Oregon Catholic Press*, 151 F.4th 1211 (9th Cir. 2025). Based on the expert and fact testimony, a jury could find that the Miller Game is, like these other protectible works, an original selection and arrangement of dozens of elements. And a jury could find 43 of those elements—encompassing the Miller Game's "distinctive aesthetic experience"—

15

copied in Lorcana. That should have sufficed to defeat summary judgment under this Court's instructions in *Ambrosetti*.

The District Court erred in concluding otherwise. It repeated the error identified by this Court in *Hanagami* of considering each element independently rather than looking at the combination as a whole. And it compounded the error by holding games to be *per se* not subject to protection, just the opposite of the approach this Court has taken in considering the application of copyright law to distinct areas.

III. In the alternative, and for purposes of preservation, the District Court erred in holding that the Copyright Act preempted Upper Deck's California-law claim for conversion of the Miller Game. Circuit precedent does instruct that the Copyright Act preempts even unprotectible ideas (unlike in the Eleventh Circuit). Upper Deck intends to challenge that precedent, if necessary, in later proceedings on the ground that it cannot be squared with the statute's text or recent Supreme Court decisions, *e.g.*, *Kansas v. Garcia*, 589 U.S. 191 (2020).

## ARGUMENT

### I. The District Court erred in holding that Upper Deck could not amend its second amended complaint regarding UCL and trade secret claims.

At the pleading stage, the District Court dismissed Upper Deck's UCL claim against Ravensburger in substantial part because Upper Deck did not expressly

include a separate claim for trade-secret misappropriation. 1-ER-44–45. The court then denied leave to amend on futility grounds. *Id.* That was reversible error.

**A.** Rule 15(a) establishes a liberal policy in favor of amendment, instructing that courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Rule 15's instruction "is to be applied with extreme liberality," and "inferences should be drawn in favor of granting" leave to amend. *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001). That aligns with the Rule's "purpose [of] provid[ing] maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *BLOM Bank SAL v. Honickman*, 605 U.S. 204, 213 (2025). A dismissal denying leave to amend is reversible "unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Polich*, 942 F.2d at 1472.

Here, the District Court held that if Upper Deck pleaded trade-secret misappropriation, then it would have a valid UCL claim. As the decision explained, trade-secret misappropriation "'can form the predicate' for an unfair UCL claim." 1-ER-44–45 (quoting *DJO Glob., Inc. v. Glader*, 2016 WL 11622009, at *8 (S.D. Cal. Dec. 22, 2016)). California courts indeed hold that trade-secret misappropriation can form the predicate for a UCL claim. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 973 P.2d 527, 544 (Cal. 1999). But the court still dismissed the UCL claim because Upper Deck had grounded its UCL claim on "misappropriation of

17

confidential information more broadly." 1-ER-45. That was inapt, the court held, as "[t]here is no trade secret misappropriation claim here that could support finding a sufficiently plead unfair act." *Id.*

Critically, the opinion identified no other defect in this UCL claim. *Id.* (rejecting Upper Deck's "argument that misappropriation of confidential information more broadly can be an unfair act" to support a UCL claim). The District Court also did not evaluate, let alone hold, that Upper Deck would be unable to revise its "misappropriation of confidential information" assertions to state a trade-secret misappropriation claim, either as a predicate to a UCL claim or on a stand-alone basis as the District Court demanded. Yet the District Court did not give Upper Deck the chance to cure the defect it identified—despite Upper Deck having asked for leave to amend, 3-ER-468—on the basis of futility.

That was error. *Owens*, 244 F.3d at 712. To the extent the court faulted Upper Deck's SAC for asserting a UCL claim based on "misappropriation of confidential information more broadly," 1-ER-45, that could not possibly justify denying leave to amend. Clearly, the right to amend under Rule 15 does not turn on whether a complaint *already* pleads a viable claim, but on whether "it is clear … that the complaint could not be saved by any amendment." *Polich*, 942 F.2d at 1472 (reversing denial of leave to amend to add a statutory claim). The District Court applied the wrong legal standard and never actually found futility, requiring reversal.

18

**B.** Moreover, Upper Deck could easily have pleaded trade-secret misappropriation to support its UCL claim and as a stand-alone claim.

Under state and federal law, a "prima facie claim for misappropriation of trade secrets requires the plaintiff to demonstrate: (1) the plaintiff owned a trade secret, (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." *Cytodyn, Inc. v. Amerimmune Pharm., Inc.*, 160 Cal. App. 4th 288, 297 (2008) (California Uniform Trade Secrets Act (CUTSA)); *accord InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) (Defend Trade Secrets Act (DTSA)'s "elements are substantially similar" to CUTSA's). A trade secret is defined broadly to include any "information" that "(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Cal. Civ. Code § 3426.1(d); *accord* 18 U.S.C. § 1839. Upper Deck could readily plead these elements.

First, the SAC already included sufficient factual allegations to state claims under CUTSA and DTSA, had Upper Deck expressly included this label and sought relief under those statutes. The SAC pleaded that the Miller Game was a trade secret. Upper Deck alleged that the Miller Game included "novel" and "proprietary"

19

mechanics, and that Ravensburger's access to it before Upper Deck launched Rush of Ikorr "allowed Ravensburger to gain a competitive advantage" and "an accelerated launch." 3-ER-474, 3-ER-484. That sufficed to allege that some Miller Game information "derive[d] independent economic value" from being secret. Cal. Civ. Code § 3426.1(d); *InteliClear*, 978 F.3d at 657. The SAC also pleaded that Miller was subject to confidentiality agreements while developing the Miller Game, 3-ER-479, showing Upper Deck made reasonable efforts to "maintain" the information's "secrecy." Cal. Civ. Code § 3426.1(d); *InteliClear*, 978 F.3d at 660. Next, the SAC pleaded that Ravensburger improperly took and used this confidential information, 3-ER-473–74, 3-ER-480–81, 3-ER-483–84, 3-ER-486, thus pleading misappropriation. And the SAC explained how Upper Deck was "harmed by Ravensburger's conduct" in taking the proprietary information. 3-ER-484. The SAC thus already contained all factual allegations needed to state a trade-secret claim.

Second, to the extent Upper Deck needed to add factual allegations, it should have been granted permission to do so. Consider *Hurn v. Retirement Fund Trust of Plumbing, Heating & Piping Industry of Southern California*, 648 F.2d 1252, 1254–55 (9th Cir. 1981). There, the district court denied permission to add "a claim under section 302 of the Taft-Hartley Act." *Id.* at 1253. On appeal, the plaintiff argued he had already stated a claim and should have been permitted to amend as needed. *Id.* The court addressed only the latter contention, holding that the plaintiff was entitled

20

to amend because his "claim is not frivolous," so "amendment cannot be considered futile." *Id.* at 1255.

The same logic applies here: Upper Deck should have been permitted to amend because its UCL and trade-secret claims would not have been frivolous. In addition to the allegations in the SAC, Upper Deck could have added details about the value of its information or any other element of a trade-secret misappropriation claim that the court may have deemed necessary. (Of course, the District Court here found no such deficiencies other than a missing "trade-secret" label.)

Post-dismissal developments only confirm that Upper Deck has a viable trade-secret misappropriation claim, as a stand-alone and to support a UCL claim. *Cf. Marin-Torres v. Washington*, 196 F. App'x 564, 565 (9th Cir. 2006) (post-discovery amendments that would be "consistent with Rule 11" "would not be futile"). As the District Court held on summary judgment, whether Miller breached his contract with Upper Deck by disclosing confidential information about the Miller Game to Ravensburger presented a dispute of fact. *E.g.*, 1-ER-25 ("On the record here, a reasonable jury could find that Miller disclosed 'Confidential Information' about Version 2.6 [i.e., the Miller Game]."). In addition, analysis by Upper Deck's expert (which the district court did not exclude) showed that Lorcana copied a novel combination of 43 game rules and mechanics from the Miller Game. *See* 2-ER-159 ("this bundle of expressions [is] both central to the overall nature of the two works and successful

21

in establishing a distinctive take on the TCG"). All of this confirms that a viable misappropriation claim existed and continues to exist, as the District Court further recognized, at least by implication, when it applied principles of misappropriation to find a viable breach of contract claim at summary judgment. 1-ER-23–25.

In sum, the Court should reverse and permit Upper Deck to plead claims for trade-secret misappropriation and UCL violations predicated on that misappropriation.

## II.   The Copyright Act protects the Miller Game's design.

A plaintiff normally proves copyright infringement to a jury by showing that it has a valid copyright and that a "defendant copied protected elements of the plaintiff's work." *Ambrosetti v. Oregon Cath. Press*, 151 F.4th 1211, 1218 (9th Cir. 2025). Thus, where a plaintiff's work enjoys a "wide range of possible expression and broad creative choices," summary judgment should be denied if "the defendant had 'access' to the plaintiff's work and … the two works are 'substantially similar.'" *Id.* at 1219, 1225 n.7. Here, access was undisputed. 1-ER-25. And Upper Deck provided expert testimony, which the District Court accepted, about how Lorcana copied a combination of 43 game rules and mechanics from the Miller Game. 2-ER-159; 2-ER-226–27. That should have been enough to go to a jury, including on the question whether Ravensburger copied protectible elements. *See Skidmore*, 952 F.3d at 1069–72 (discussing jury instruction on originality); *Twentieth Century-Fox Film*

22

*Corp. v. MCA, Inc.*, 715 F.2d 1327, 1330 n.6 (9th Cir. 1983) ("Since substantial similarity is usually an extremely close question of fact, summary judgment has traditionally been disfavored in copyright litigation.")

But the District Court dismissed the claim as a matter of law because, according to the court, no combination of game rules and mechanics, no matter how complex, could *ever* be protected. This was legal error. Under well-established law, a "unique combination" of unprotected facts or ideas *can* be protected where "the kaleidoscope of an overall work" is expressive, as the whole is often greater than the sum of its parts. *Ambrosetti*, 151 F.4th at 1225. A jury could find that the Miller Game is copyrightable, because "[t]he relationship between [the game mechanics] and the [creator's] creative approach of composing and arranging them together, is what defines the work." *Hanagami v. Epic Games, Inc.*, 85 F.4th 931, 944 (9th Cir. 2023). This Court should reverse and remand the copyright claim for trial—or, at the very least, direct the district court to reassess substantial similarity under the proper framework.

## A. Combinations of unprotected ideas can be protected expressions.

Copyright law has long distinguished between ideas, which are not copyrightable, and expressive "compilations" of those ideas, which are. *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*, 499 U.S. 340, 345–46 (1991). "This "traditional … idea/expression dichotomy" is now "codified" in the Copyright Act,

*Golan v. Holder*, 565 U.S. 302, 328 (2012), which broadly protects "original works of authorship fixed in any tangible medium of expression," including "compilation[s]," but leaves "idea[s]" unprotected. 17 U.S.C. §§ 101, 102.

This "idea/expression dichotomy, codified by Section 102(b)," "assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a work." *Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032, 1037, 1040 (9th Cir. 2015) (quoting *Feist*, 499 U.S. at 349–50); *see* 3 Patry on Copyright § 4:45; *see also, e.g., Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 615 (7th Cir. 1982) ("There is no litmus paper test by which to apply the idea-expression distinction; the determination is necessarily subjective.").

At the end of the day, the "*sine qua non* of copyright is originality," *Feist*, 499 U.S. at 345, which is a fact question, *Skidmore*, 952 F.3d at 1069–72. So long as an original work possesses even an "extremely low" "level of creativity," it may receive copyright protection. *Feist*, 499 U.S. at 345. For example, the Supreme Court held that a book on a book-keeping system was protected, even if the system itself was just an "idea," *i.e.*, "useful knowledge" with "practical application." *Baker v. Selden*, 101 U.S. 99, 103–04 (1879). Moreover, although "individual words, numbers, notes, colors, or shapes are not protected," sufficiently complex and original combinations

24

of those items are and can be protected. *Hanagami*, 85 F.4th at 940 (individual dance elements are not copyrightable, but dance routine may be).

In line with this precedent and the Supreme Court's instructions, this Court has held that a sufficiently original "selection and arrangement" of unprotected elements can be protected. *Id.* at 943; *see Feist*, 499 U.S. at 349. The protection covers not the underlying elements, but rather "the particular way in which the artistic elements form a coherent pattern, synthesis, or design." *Skidmore*, 952 F.3d at 1074. This reflects common-sense: although "[e]ach note in a scale is not protectable, … a pattern of notes in a tune may earn copyright protection." *Id.* A court must look at the number of elements in the combination, the combination's originality, and the amount of creativity reflected in the combination, but should not look at the elements individually. *Ambrosetti*, 151 F.4th at 1224–25.

Courts apply this test in various contexts. *Hanagami*, 85 F.4th at 943 (noting the doctrine applies to dance, music, and photography, among other things). For instance, in *Ambrosetti* the plaintiff alleged that the defendant copied his liturgical song in her own music composition. 151 F.4th at 1215. The plaintiff presented "a list of twenty-three aggregate similarities between the works" as evidence. *Id.* at 1224. The defendant raised several objections, including that the elements comprising the plaintiff's purported "list of similarities" was not "sufficient to meet [the court's] criteria for a selection and arrangement theory." *Id.* The Court rejected this

25

argument, emphasizing that it "would be improper" to "break down the work[] into [its component parts] and analyze each element alone." *Id.* at 1225. The point was that the overall work reflected a "unique combination" and was thus "protectable." *Id.* And because the plaintiff's expert testified that the unique combination of elements in the defendant's song was substantially similar to the plaintiff's, the Court determined there was a fact question on infringement necessitating trial. *Id.* at 1223, 1226.

This is also the rule for games. "Games are the defining artform of the twenty-first century." Frank Lantz, *The Beauty of Games* at 7 (2023). "[G]ames can provide all sorts of … aesthetic experiences through the manipulation of agency—including senses of constriction, of drama, of tragedy[.]" C. Thi Nguyen, *Games: Agency as Art* at 26 (2020). Thus, games may reflect original and expressive combinations of ideas and, as such, receive copyright protection (whether broad or narrow). *Accord Hanagami*, 85 F.4th at 944 ("We see no reason to treat choreography differently" than music). "As a work embodies more in the way of particularized expression, it moves farther away from [a practical idea that has broad application and use], and receives broader copyright protection." *Atari*, 672 F.2d at 617.

So although an individual rule for playing a game, or "stock literary devices are not protectible by copyright"—"as a practical matter," these are "indispensable, or at least standard, in the treatment of a given topic"—a unique and creative

combination of those elements in a particular game can be protected, so long as it reflects the requisite originality. *Id.* at 616; *cf. Satava v. Lowry*, 323 F.3d 805, 813 (9th Cir. 2003) ("Nature gives us ideas of animals in their natural surroundings: an eagle with talons extended to snatch a mouse" and "no artist may use copyright law to prevent others from depicting them," but "[a]n artist may… protect the original expression he or she contributes to these ideas" such as by "vary[ing] the pose, attitude, gesture, muscle structure, facial expression, coat, or texture of animal.").

### B. The Miller Game contained a unique and expressive combination of elements that is subject to copyright protection.

Under this Circuit's case law analyzing protectible works of authorship, a jury could find that Ravensburger infringed the Miller Game and its elements—including the combination of 43 elements Ravensburger copied—because these constituted an original "selection and arrangement" qualifying for copyright protection. *Ambrosetti*, 151 F.4th at 1224.

The evidence was adequate to permit a jury to find that the Miller Game's combination of 43 elements reflected an original "non-public combination of game mechanics," 1-ER-24–25, in both selection and arrangement, *Ambrosetti*, 151 F.4th at 1224. This is a far greater number of elements than the Court previously deemed adequate to support a copyright claim. *Ambrosetti*, 151 F.4th at 1225 (23 elements); *Hanagami*, 85 F.4th at 946 ("four counts" of dance steps); *see also Baxter v. MCA, Inc.*, 812 F.2d 421, 425 (9th Cir. 1987) ("Even if a copied portion be relatively small

27

in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity."). Upper Deck's expert Ian Bogost opined, reviewing the evidence and applying his expertise, that "this specific bundle of expressions of superordinate TCG ideas gives The Miller Game a distinctive aesthetic experience when played" that "feel[s] very different from other TCGs" that came before it, and that "this central bundle of expression sits at the heart of The Miller Game as a creative work." 2-ER-163. That sort of expert testimony, which the District Court declined to exclude on *Daubert* grounds or otherwise, suffices to warrant trial. *Ambrosetti*, 151 F.4th at 1223, 1226; *Hanagami*, 85 F.4th at 945 ("In many cases, application of the extrinsic test requires analytical dissection of a work and expert testimony because most judges are not sufficiently trained in the specifics of the art form at issue to make reliable conclusions about similarity.").

Of course, no one disputes that a single rule like alternating turns is an unprotected "idea." *Allen v. Acad. Games League of Am., Inc.*, 89 F.3d 614, 618 (9th Cir. 1996) (rejecting a "monopoly" on "commonplace ideas"). But the design of a complex trading-card game like the Miller Game consists of a selection and arrangement of myriad unprotectible elements—"rules"; "mechanics"; and how they "interact with each other"—that reflects a unique expression of authorship for players. 2-ER-237–38; *see* 2-ER-163. In combining the elements of the game, "a lot of questions … must be answered about how the game is played," each of which "can be

28

answered in multiple ways" and all of which affect the experience. 2-ER-238. The many choices that went into the Miller Game make it expressive, akin to literature or music, as they "form [the game's expressive] essence, and [make its] object the production of pleasure." *Baker*, 101 U.S. at 103–04. This means a jury could reasonably find, based on the fact evidence and expert testimony, that the Miller Game's combination was expressive and original. And thus protected.

### C. The District Court's analysis was erroneous.

As noted, at summary judgment on a copyright claim, a court assesses only whether a reasonable jury could find that "two works share a similarity of ideas and expression as measured by external, objective criteria." *Williams v. Gaye*, 895 F.3d 1106, 1119 (9th Cir. 2018). Where, as here, an expert has opined that the plaintiff's selection and arrangement is "substantially similar" to the defendant's, "the case *must* be submitted to a trier of fact." *Ambrosetti*, 151 F.4th at 1224 (emphasis added). In granting summary judgment, the District Court erred multiple times over.

To begin, the court erred by analyzing each of the 43 mechanics separately as individual elements. This Court's recent decisions emphasize that, when considering a copyright claim to an expressive combination of unprotected elements, a court should *not* "separate out each piece of glass within the kaleidoscope of an overall work"; it "must view the work as the sum of all the relevant elements." *Id.* at 1225. In *Hanagami*, for example, this Court reversed a district court's application of the

29

extrinsic test to dance choreography on a motion to dismiss for being "fundamentally at odds with the way we analyze copyright claims for other art forms, like musical compositions." 85 F.4th at 942. The Court emphasized that the choreographic work must be considered as a whole, not just as a handful of "poses." *Id.*; *see also Ambrosetti*, 151 F.4th at 1225 ("While defendants would have us break down the works into pitch sequences, rhythms, and metrical placements and analyze each element alone, doing so would be improper.").

Yet, the District Court committed the same error as in *Hanagami*, dismissing out of hand Upper Deck's argument that the "unique expression [that] comes from the bundle of properties" in a complex trading-card game is protected, 2-ER-204, on the ground that "unprotectable game mechanics that are standard in TCGs"—*i.e.*, the underlying elements combined in the Miller Game—are "ideas … not protected by copyright law." 1-ER-19. The court erred in analyzing each rule and element individually, as it should have considered the combination of rules and mechanics in the Miller Game as a whole.

Next, the District Court also erred in holding that game-rule combinations can never be protected as a matter of law. There is no justification in the law for failing to apply ordinary idea/expression doctrine simply because a game is involved, and the law does not create such a *per se* exemption for games. *Accord Hanagami*, 85 F.4th at 944. Holding otherwise, the District Court cited a New Jersey District Court

case, *Tetris Holding, LLC v. Xio Interactive, Inc.*, for the proposition that "game mechanics and the rules are not entitled to protection[.]" 863 F. Supp. 2d 394, 404 (2012). But *Tetris* actually rejected the proposition that expressions of ideas reflected in a game are "unprotectible merely because" they are "related to a game rule or game function." *Id.* at 406–07 (citing *Atari*, 672 F.2d at 617). *Tetris* also held that a defendant's copying of "expressive elements" from the plaintiff's puzzle game, such as a "playing field" that is "20 units high by 10 units wide," was infringing. *Id.* at 404, 413. The *Tetris* court certainly did not discern a legal rule holding that combinations of rules and elements in games, including complex trading-card games, can never be protected by copyright, as the District Court held here.

The District Court also cited *Landsberg v. Scrabble Crossword Game Players, Inc.*, 736 F.2d 485 (9th Cir. 1984). But that case is again inapposite. It concerned whether an author's copyright to a Scrabble strategy guide extended to the underlying Scrabble strategies. *Id.* at 486, 488–89. After holding the defendant did not "duplicate the selection, coordination, and arrangement of the ideas in [plaintiff's work]"—*i.e.*, the original combinations in the strategy guide—this Court concluded that the "similarities between the two works" were "no more than the similarity that must unavoidably be produced by anyone who wishes to use and restate the unprotectable ideas contained in [plaintiff's work]"—i.e., the strategies themselves, such as the suggestion that "[t]he poor player simply attempts to make

31

as many points as possible each turn." *Id.* at 488–89. That is a far cry from here, where Upper Deck provided evidence from which a jury could find that Ravensburger copied an entire complex selection and arrangement.

Finally, the Copyright Office's nonbinding commentary about games does not support the District Court's sweeping decision. The District Court interpreted the commentary as standing for the proposition that no combination of game rules and mechanics can ever be expressive because, per its reading of the commentary, an "idea" or "method" of playing a game is not protected. 1-ER-16. This misreads the guidance, which simply restates § 102 and the idea/expression dichotomy; it does not announce a categorical rule taking all games outside of the protections of the Copyright Act. The commentary states that various categories of knowledge not protected by § 102(b), like ideas, methods, or systems, are not protected in the context of games, while recognizing that copyright *does* protect "the particular manner of an author's expression in literary or artistic elements that the work may contain." *Id.* This passage thus cannot be read to bar copyright protection for an original selection and arrangement of game mechanics—a recognized form of expression.

Nor should the Copyright Office's commentary be read as announcing such a broad categorical bar on copyrighting complex game designs. As a leading treatise warns, the "difficulty" of distinguishing idea from expression "should make courts

32

extremely wary of announcing rules to be applied to classes of subject matter, since broad formulations are likely to be incapable of taking into account the wide varieties of creativity found in different works of authorship." 3 Patry on Copyright § 4:45. There is no reason in law or logic to take a different approach for games.

This Court's precedents are in accord: it held that a series of yoga poses is an unprotected "system," *Bikram's Yoga*, 803 F.3d at 1038, yet later held that a four-count dance sequence could be expressive and protected, *Hanagami*, 85 F.4th at 943. In each case, the court considered various relevant factors, like the need to "balance between competition and protection," *Bikram's Yoga*, 803 F.3d at 1040, and went out of its way to avoid "draw[ing] … bright line[s]," *Hanagami*, 85 F.4th at 940. Endorsing the District Court's categorical rule against finding game designs copyrightable would abandon this balance and nuance, ignore this Court's guidance in *Hanagami* and other cases, and improperly deny protection to works that involve years of creative labor and a vast universe of possible authorship choices.

\*    \*    \*

Expert and fact testimony established that the complex combination of game rules and mechanics forming the Miller Game reflects creativity and originality, placing it in the heartland of copyright protection. The Copyright Act protects "a sliding-piece puzzle with a 'traffic jam' theme, the goal of which is to maneuver a single vehicle out of an enclosed lot which is filled by other vehicles that restrict

33

each other's movement." *Rubin v. Binary Arts Corp.*, 1998 WL 917797, at *4 (N.D. Cal. Dec. 24, 1998). It protects an "interactive" "art installation depicting the cosmos, stars, and galaxies" that allows "viewers [to] control the pattern and speed of the blinking lights as they pass through the exhibit." *teamLab Inc. v. Museum of Dream Space, LLC*, 650 F. Supp. 3d 934, 952–53 (C.D. Cal. 2023). It must likewise protect the 43 interconnected game rules and mechanics that come together as expression, or at least a jury could so find given the fact evidence and expert testimony presented in this case. This Court should reverse.

### III. Alternatively, if the Miller Game's combination of rules and mechanics is an idea, Ninth Circuit precedent holding the Copyright Act preempts state law claims based on ideas should be overruled.

The parties and District Court agreed that, under this Court's precedents, the Copyright Act preempted Upper Deck's conversion claim against Defendants even if the Copyright Act did not protect the Miller Game here. 1-ER-27; *Montz v. Pilgrim Films & Television, Inc.*, 649 F.3d 975, 979 (9th Cir. 2011) (en banc) (holding that claims to ownership of "ideas … that are fixed in a tangible medium" can be preempted "despite the exclusion of fixed ideas from the scope of actual federal copyright protection"). Although Upper Deck recognizes that this Court is bound by *Montz*, Upper Deck intends to challenge that precedent as erroneously decided in later proceedings, if necessary.

34

This Court has "adopted a two-part test to determine whether a state law claim is preempted by the [Copyright] Act." *Best Carpet Values, Inc. v. Google, LLC*, 90 F.4th 962, 971 (9th Cir. 2024). "First, [the Court] decide[s] whether the subject matter of the state law claim falls within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103." *Id.* Any fixed ideas—such as game mechanics that are written down—fall within the subject matter of copyright even though fixed ideas are excluded from the Act's protection. *Montz*, 649 F.3d at 980 (acknowledging ideas are not protected under 17 U.S.C. § 102). Thus, state-law claims based on the conversion of ideas are preempted unless a party shows (under step two) that the "cause of action … assert[s] rights that are qualitatively different from the rights protected by copyright." *Id*. Here, because Upper Deck asserts violations of its exclusive rights to reproduce, distribute copies of, or create derivative works of its intellectual property, controlling Ninth Circuit precedent would find its cause of action preempted. *See id.* at 980; *Best Carpet*, 90 F.4th at 973–74.

Upper Deck respectfully submits that this caselaw cannot be squared with the Copyright Act's text or recent Supreme Court decisions. The Act expressly excludes any "idea" from copyright protection, 17 U.S.C. § 102(b), so *Montz* erred by holding that the Act's preemption provision applies to state-law claims asserting state-law protection over matters not subject to federal-copyright protection, *compare* 649 F.3d at 979–80 (holding § 301 preemption applies), *with* 17 U.S.C. § 301

35

(preempting only "works of authorship that are fixed in a "tangible medium of expression *and* come within the subject matter of copyright as specified by sections 102 and 103" (emphasis added)). Indeed, the Eleventh Circuit has taken the opposite position, holding that because "[i]deas are substantively ineligible for copyright protection … [,] a plaintiff's claim for conversion of his ideas—even original ideas expressed in a tangible medium—is not preempted by the Copyright Act." *Dunlap v. G&L Holding Grp., Inc.*, 381 F.3d 1285, 1297 (11th Cir. 2004).

The Ninth Circuit's position also conflicts with recent Supreme Court cases emphasizing the need to ground statutory preemption on statutory text. *E.g.*, *Garcia*, 589 U.S. at 202–13 (holding Kansas law not preempted). The Copyright Act contains no text requiring displacement of state-law protections that cover subject matter not subject to copyright protection.

36

# CONCLUSION

This Court should (1) reverse the District Court's denial of Upper Deck's motion for leave to amend and allow it to cure its UCL claim and add a trade-secret misappropriation claim and (2) reverse the District Court's summary judgment decision on Upper Deck's copyright claim.

Date: February 27, 2026

Respectfully submitted,

*/s/ Vincent Levy*
Vincent Levy
  *Counsel of Record*
Jack L. Millman
Colin A. Mark
HOLWELL SHUSTER &
GOLDBERG LLP
425 Lexington Ave
New York, New York
T: 646-837-5120
E: vlevy@hsgllp.com

Steven W. Fogg
Eric A. Lindberg
CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington
T: (206) 625-8600
E: sfogg@corrcronin.com
   elindberg@corrcronin.com

Mark P Walters
LOWE GRAHAM JONES PLLC
1325 Fourth Avenue, Suite 1130
Seattle, Washington
T: 206-381-3300
E: walters@lowegrahamjones.com

Alex Tomasecvic
Shaun Markley
NICHOLAS & TOMASEVIC LLP
225 Broadway 19th Floor
San Diego, CA 92101
T: 619-325-0492
E: atomasevic@nicholaslaw.org
    smarkley@nicholaslaw.org

Mitchell D. West
Lowe Graham Jones PLLC
1325 4th Avenue Suite 1130
Seattle, WA 98101
T: 206-381-3300
E: west@lowegrahamjones.com

Miles A. Yanick
YANICK LAW & DISPUTE
RESOLUTION PLLC
1325 4th Avenue Suite 1130
Seattle, WA 98101

*Attorneys for Plaintiff-Appellant The Upper Deck Company*

## APPENDIX A

The below table shows the overlap between a combination of 43 features in the Miller Game and 43 features in Lorcana. *See* 2-ER-143–69; 2-ER-188–97; 2-ER-241–43, 2-ER-246–53, 2-ER-255–328; 3-ER-339–73; 3-ER-382; 3-ER-394–98; 3-ER-404–12.

| The Miller Game | Disney Lorcana |
|---|---|
| The Miller Game is a TCG played with **(1)** decks of specialized, collectible cards, which cards vary in rarity. | Lorcana is a TCG played with **(1)** decks of specialized, collectible cards, which cards vary in rarity. |
| The game comes with a **(2)** "game overview" that provides narrative context for the gameplay. | The game comes with a **(2)** "game overview" that provides narrative context for the gameplay. |
| Each card has a **(3)** title, a **(4)** color designation, and **(5)** card text identifying the abilities and effects the card can use. | Each card has a **(3)** title, an **(4)** "ink color" designation, and **(5)** card text identifying the abilities and effects the card can use. |
| Included in the card text are **(6)** keywords: descriptors that have no in-game effect unless another card's ability specifically invokes that keyword. Cards can have a **(7)** Recruit Cost, indicating how much of an in-game resource the player must spend to play the card; a **(8)** Strength number, indicating how much damage the card deals to other cards during play; and a **(9)** "Raid" value, indicating how many points toward victory the card contributes when used to "raid"—i.e., accumulate points to win the game. | Included in the card text are **(6)** keywords: descriptors that have no in-game effect unless another card's ability specifically invokes that keyword. Cards can have a **(7)** "Cost," indicating how much of an in-game resource ("Ink") the player must spend to play the card; a **(8)** Strength number, indicating how much damage the card deals when "challenging" another; and a **(9)** "Lore" value, indicating how many points toward victory the card contributes when used to "quest"—i.e., accumulate "lore" to win the game. |

39

| | |
|---|---|
| Cards include (10) "Champions"—the characters that each player deploys, who may have "abilities"; (11) "Spells"—powerful, one-time actions that the player can take to help secure victory, which are discarded as soon as they are played; and (12) Locations—cards put into play that stay in play until they are destroyed by enemy champions, spells, or abilities. | Cards include (10) "Characters"—the units each player deploys, which may have "abilities"; (11) "Actions"—powerful, one-time effects that the player can take to help secure victory, which are discarded as soon as they are played; and (12) Locations—cards put into play that stay in play until removed by opposing characters, actions, or abilities. |
| A card's (13) designated color corresponds to one of six themes. | A card's (13) designated "ink color" corresponds to one of six themes: Amber, Amethyst, Emerald, Ruby, Sapphire, or Steel. |
| Players (14) build their deck out of a subset of game cards that the players have collected, subject to certain restrictions, chief among them that players may use only two colors per deck. | Players (14) build their deck out of a subset of game cards that the players have collected, subject to certain restrictions, chief among them that players may use only two ink colors per deck. |
| Gameplay starts with a (15) regimented set-up: | Gameplay starts with a (15) regimented set-up: |
| • Each player shuffles their decks, then places face-up a card signifying, among other things, their choice of two colors for their deck; | • Each player places a two-color deck face down. |
| • Each player draws a hand of cards. | • Each player draws a hand of cards. |
| • Each player has an opportunity to redraw their starting hand of cards. | • Each player has an opportunity to exchange unwanted cards from that first hand. |

40

| | |
|---|---|
| To win the Miller Game, a player must score a fixed number of points—**(16)** tracked with counters—where points are scored through **(17)** using Champions to "raid" instead of for other purposes (e.g., attacking enemy Champions). | To win Disney Lorcana, a player must win a fixed number of "lore" (i.e., points, **(16)** tracked with a counter) by **(17)** using Characters to "quest" instead of for other purposes (e.g., challenging enemy Characters). |
| The game is **(18)** played in alternating turns, and **(19)** each player's turn proceeds seriatim through various phases. First, **(20)** the player conveys—by **(21)** rotating the cards to a vertical alignment—that all cards in play are "ready" to be used that turn. At this point, the player is deemed to have won any pending points from the previous turn's "raids." | The game is **(18)** played in alternating turns, and **(19)** each player's turn proceeds seriatim through various phases. First, **(20)** the player conveys—by **(21)** rotating the cards to a vertical alignment—that all cards in play are "ready" to be used that turn. |
| The player then draws one card. The player then takes the new top card of the player's deck and places it face down into a permanent **(22)** "pseudo-discard pile"; **(23)** cards in this pile become resources that the player can spend on playing **(24)** Champions, **(25)** Spells, or **(26)** Locations. | The player then draws one card. In every turn, the player may put one card from the player's hand face down into a **(22)** permanent pile called the "Ink-well"; **(23)** cards in the Inkwell become "Ink" that the player can spend on playing **(24)** Characters, **(25)** Actions, or **(26)** Locations. |
| After adding a card as a resource, the player may then **(27)** spend resources (by **(28)** turning the corresponding cards sideways) to play a new card. | During the turn, the player may **(27)** spend Ink (by **(28)** turning the corresponding Inkwell cards sideways) to play a new card. |
| The player may then **(29)** have a card use its "ability". | The player may then **(29)** have a card use its "ability". |
| Next, the player may **(30)** "raid" with a ready Champion that has been in play for at least one prior turn; the Champion is **(31)** turned sideways and | Next, the player may **(30)** "quest" with a ready Character that has been in play for at least one prior turn;  the Character is **(31)** turned sideways, and |

41

| | |
|---|---|
| **(32)** counters designate that it is accumulating victory points. | **(32)** wins the player lore equal to its Lore value, with trackers designating accumulated victory progress. |
| Finally, the player may **(33)** use a ready Champion to attack an enemy Champion that is raiding—in general, **(34)** only sideways Champion cards are vulnerable to attack. Combat is **(35)** resolved by comparing the Strength values of the two Champions, and the loser is removed from play. | Finally, the player may **(33)** use a ready Character to challenge an enemy Character—in general, **(34)** only sideways Character cards are vulnerable to challenge. Combat is **(35)** resolved by each character dealing damage equal to its Strength to the opposing character's Willpower; any character with damage meeting or exceeding its Willpower is "banished" from play (both may be banished). |
| As noted, Champions may have "abilities" that alter the default rules applicable to other Champions, including: | As noted, Characters may have "abilities" that alter the default rules applicable to other Characters, including: |
| • **(36)** Only Champions with this same ability can attack this Champion; | • **(36)** Only Characters with this same ability can challenge this Character. |
| • **(37)** This Champion can "Support," adding Strength points to another Champion for one turn; | • **(37)** This Character can "Support," adding Strength points to another Character for one turn. |
| • **(38)** This Champion is a "Fighter" who can only attack, not raid; | • **(38)** This Character is "Reckless" and can (and must) only challenge others, not quest. |
| • **(39)** If this Champion is raiding, it attracts all attacks; | • **(39)** This Character attracts all challenges when turned sideways. |
| • **(40)** If this Champion loses a battle, the opposing Champion *also* loses; | • **(40)** If this Character is challenged and loses, the opposing Character *also* loses. |

42

| | |
|---|---|
| • **(41)** This Champion may attack the turn it is played; | • **(41)** This Character may challenge the turn it is played. |
| • **(42)** This Champion cannot be targeted for (non-attacking) enemy effects. | • **(42)** This Character cannot be chosen by opponents' (non-challenging) effects. |
| Finally, the Miller Game includes **(43)** "Overlay" cards: cards placed on top of other cards that modify the underlying card—for example, a card that *gives* the underlying Champion the ability to attract all attacks when raiding. | Finally, Disney Lorcana includes **(43)** "Shift" cards: cards overlaid on top of another version of the same Character that grant the Character different abilities—for example, a card that *gives* the underlying Character the ability to attract all challenges when turned sideways. |

43

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**: 25-7299

I am the attorney.

**This brief, including its appendix, contains 9,995 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

Date: February 27, 2026       */s/ Vincent Levy* _____
                             Vincent Levy
                             HOLWELL SHUSTER & GOLDBERG LLP
                             425 Lexington Ave
                             New York, New York
                             T: 646-837-5120
                             E: vlevy@hsgllp.com

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS

17 U.S. Code § 101 – Definitions (Excerpt).......................................................ADD-1

17 U.S. Code § 102 - Subject matter of copyright: In general ........................ADD-1

18 U.S. Code § 1836 - Civil proceedings ........................................................ADD-2

18 U.S. Code § 1839 – Definitions ................................................................ADD-9

Business and Professions Code..................................................................ADD-11

    17200 ...........................................................................................ADD-11

    17201 ...........................................................................................ADD-11

    17201.5 ........................................................................................ADD-12

    17202 ...........................................................................................ADD-12

    17203 ...........................................................................................ADD-12

    17204 ...........................................................................................ADD-12

    17205 ...........................................................................................ADD-13

    17206 ...........................................................................................ADD-13

    17206.1 ........................................................................................ADD-15

    17206.2 ........................................................................................ADD-17

    17207 ...........................................................................................ADD-18

    17208 ...........................................................................................ADD-19

    17209 ...........................................................................................ADD-19

    17210 ...........................................................................................ADD-20

California Code Civil Code .........................................................................ADD-22

    3426 .............................................................................................ADD-22

    3426.1 ..........................................................................................ADD-22

    3426.2 ..........................................................................................ADD-23

    3426.3 ..........................................................................................ADD-24

    3426.4 ..........................................................................................ADD-24

    3426.5 ..........................................................................................ADD-25

    3426.6 ..........................................................................................ADD-25

    3426.7 ..........................................................................................ADD-25

    3426.8 ..........................................................................................ADD-26

    3426.9 ..........................................................................................ADD-26

    3426.10 ........................................................................................ADD-26

    3426.11 ........................................................................................ADD-27

Federal Rules of Civil Procedure Rule 15. Amended and
Supplemental Pleadings ..............................................................................ADD-28

**17 U.S. Code § 101 – Definitions (Excerpt):**

A "compilation" is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship. The term "compilation" includes collective works.

**17 U.S. Code § 102 - Subject matter of copyright: In general:**

(a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:

   (1) literary works;

   (2) musical works, including any accompanying words;

   (3) dramatic works, including any accompanying music;

   (4) pantomimes and choreographic works;

   (5) pictorial, graphic, and sculptural works;

   (6) motion pictures and other audiovisual works;

   (7) sound recordings; and

   (8) architectural works.

(b) In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

(Pub. L. 94–553, title I, § 101, Oct. 19, 1976, 90 Stat. 2544; Pub. L. 101–650, title VII, § 703, Dec. 1, 1990, 104 Stat. 5133.)

ADD-1

**18 U.S. Code § 1836 - Civil proceedings:**

(a) The Attorney General may, in a civil action, obtain appropriate injunctive relief against any violation of this chapter.

(b) Private Civil Actions.—

(1) In general.—

An owner of a trade secret that is misappropriated may bring a civil action under this subsection if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.

(2) Civil seizure.—

(A) In general.—

(i) Application.—

Based on an affidavit or verified complaint satisfying the requirements of this paragraph, the court may, upon ex parte application but only in extraordinary circumstances, issue an order providing for the seizure of property necessary to prevent the propagation or dissemination of the trade secret that is the subject of the action.

(ii) Requirements for issuing order.—The court may not grant an application under clause (i) unless the court finds that it clearly appears from specific facts that—

(I) an order issued pursuant to Rule 65 of the Federal Rules of Civil Procedure or another form of equitable relief would be inadequate to achieve the purpose of this paragraph because the party to which the order would be issued would evade, avoid, or otherwise not comply with such an order;

(II) an immediate and irreparable injury will occur if such seizure is not ordered;

(III) the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application and

**ADD-2**

substantially outweighs the harm to any third parties who may be harmed by such seizure;

(IV) the applicant is likely to succeed in showing that—

(aa) the information is a trade secret; and

(bb) the person against whom seizure would be ordered—

(AA) misappropriated the trade secret of the applicant by improper means; or

(BB) conspired to use improper means to misappropriate the trade secret of the applicant;

(V) the person against whom seizure would be ordered has actual possession of—

(aa) the trade secret; and

(bb) any property to be seized;

(VI) the application describes with reasonable particularity the matter to be seized and, to the extent reasonable under the circumstances, identifies the location where the matter is to be seized;

(VII) the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person; and

(VIII) the applicant has not publicized the requested seizure.

(B) Elements of order.—If an order is issued under subparagraph (A), it shall—

(i) set forth findings of fact and conclusions of law required for the order;

**ADD-3**

(ii) provide for the narrowest seizure of property necessary to achieve the purpose of this paragraph and direct that the seizure be conducted in a manner that minimizes any interruption of the business operations of third parties and, to the extent possible, does not interrupt the legitimate business operations of the person accused of misappropriating the trade secret;

(iii)

    (I) be accompanied by an order protecting the seized property from disclosure by prohibiting access by the applicant or the person against whom the order is directed, and prohibiting any copies, in whole or in part, of the seized property, to prevent undue damage to the party against whom the order has issued or others, until such parties have an opportunity to be heard in court; and

    (II) provide that if access is granted by the court to the applicant or the person against whom the order is directed, the access shall be consistent with subparagraph (D);

(iv) provide guidance to the law enforcement officials executing the seizure that clearly delineates the scope of the authority of the officials, including—

    (I) the hours during which the seizure may be executed; and

    (II) whether force may be used to access locked areas;

(v) set a date for a hearing described in subparagraph (F) at the earliest possible time, and not later than 7 days after the order has issued, unless the party against whom the order is directed and others harmed by the order consent to another date for the hearing, except that a party against whom the order has issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the applicant who obtained the order; and

(vi) require the person obtaining the order to provide the security determined adequate by the court for the payment of the damages

**ADD-4**

that any person may be entitled to recover as a result of a wrongful or excessive seizure or wrongful or excessive attempted seizure under this paragraph.

(C) Protection from publicity.—

The court shall take appropriate action to protect the person against whom an order under this paragraph is directed from publicity, by or at the behest of the person obtaining the order, about such order and any seizure under such order.

(D) Materials in custody of court.—

(i) In general.—

Any materials seized under this paragraph shall be taken into the custody of the court. The court shall secure the seized material from physical and electronic access during the seizure and while in the custody of the court.

(ii) Storage medium.—

If the seized material includes a storage medium, or if the seized material is stored on a storage medium, the court shall prohibit the medium from being connected to a network or the Internet without the consent of both parties, until the hearing required under subparagraph (B)(v) and described in subparagraph (F).

(iii) Protection of confidentiality.—

The court shall take appropriate measures to protect the confidentiality of seized materials that are unrelated to the trade secret information ordered seized pursuant to this paragraph unless the person against whom the order is entered consents to disclosure of the material.

(iv) Appointment of special master.—

The court may appoint a special master to locate and isolate all misappropriated trade secret information and to facilitate the return of unrelated property and data to the person from whom the property was

**ADD-5**

seized. The special master appointed by the court shall agree to be bound by a non-disclosure agreement approved by the court.

(E) Service of order.—

The court shall order that service of a copy of the order under this paragraph, and the submissions of the applicant to obtain the order, shall be made by a Federal law enforcement officer who, upon making service, shall carry out the seizure under the order. The court may allow State or local law enforcement officials to participate, but may not permit the applicant or any agent of the applicant to participate in the seizure. At the request of law enforcement officials, the court may allow a technical expert who is unaffiliated with the applicant and who is bound by a court-approved non-disclosure agreement to participate in the seizure if the court determines that the participation of the expert will aid the efficient execution of and minimize the burden of the seizure.

(F) Seizure hearing.—

(i) Date.—

A court that issues a seizure order shall hold a hearing on the date set by the court under subparagraph (B)(v).

(ii) Burden of proof.—

At a hearing held under this subparagraph, the party who obtained the order under subparagraph (A) shall have the burden to prove the facts supporting the findings of fact and conclusions of law necessary to support the order. If the party fails to meet that burden, the seizure order shall be dissolved or modified appropriately.

(iii) Dissolution or modification of order.—

A party against whom the order has been issued or any person harmed by the order may move the court at any time to dissolve or modify the order after giving notice to the party who obtained the order.

(iv) Discovery time limits.—

**ADD-6**

The court may make such orders modifying the time limits for discovery under the Federal Rules of Civil Procedure as may be necessary to prevent the frustration of the purposes of a hearing under this subparagraph.

(G) Action for damage caused by wrongful seizure.—

A person who suffers damage by reason of a wrongful or excessive seizure under this paragraph has a cause of action against the applicant for the order under which such seizure was made, and shall be entitled to the same relief as is provided under section 34(d)(11) of the Trademark Act of 1946 (15 U.S.C. 1116(d)(11)). The security posted with the court under subparagraph (B)(vi) shall not limit the recovery of third parties for damages.

(H) Motion for encryption.—

A party or a person who claims to have an interest in the subject matter seized may make a motion at any time, which may be heard ex parte, to encrypt any material seized or to be seized under this paragraph that is stored on a storage medium. The motion shall include, when possible, the desired encryption method.

(3) Remedies.—In a civil action brought under this subsection with respect to the misappropriation of a trade secret, a court may—

(A) grant an injunction—

(i) to prevent any actual or threatened misappropriation described in paragraph (1) on such terms as the court deems reasonable, provided the order does not—

(I) prevent a person from entering into an employment relationship, and that conditions placed on such employment shall be based on evidence of threatened misappropriation and not merely on the information the person knows; or

(II) otherwise conflict with an applicable State law prohibiting restraints on the practice of a lawful profession, trade, or business;

**ADD-7**

(ii) if determined appropriate by the court, requiring affirmative actions to be taken to protect the trade secret; and

(iii) in exceptional circumstances that render an injunction inequitable, that conditions future use of the trade secret upon payment of a reasonable royalty for no longer than the period of time for which such use could have been prohibited;

(B) award—

(i)

(I) damages for actual loss caused by the misappropriation of the trade secret; and

(II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss; or

(ii) in lieu of damages measured by any other methods, the damages caused by the misappropriation measured by imposition of liability for a reasonable royalty for the misappropriator's unauthorized disclosure or use of the trade secret;

(C) if the trade secret is willfully and maliciously misappropriated, award exemplary damages in an amount not more than 2 times the amount of the damages awarded under subparagraph (B); and

(D) if a claim of the misappropriation is made in bad faith, which may be established by circumstantial evidence, a motion to terminate an injunction is made or opposed in bad faith, or the trade secret was willfully and maliciously misappropriated, award reasonable attorney's fees to the prevailing party.

(c) Jurisdiction.—

The district courts of the United States shall have original jurisdiction of civil actions brought under this section.

**ADD-8**

(d) Period of Limitations.—

A civil action under subsection (b) may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered. For purposes of this subsection, a continuing misappropriation constitutes a single claim of misappropriation.

(Added Pub. L. 104–294, title I, § 101(a), Oct. 11, 1996, 110 Stat. 3490; amended Pub. L. 107–273, div. B, title IV, § 4002(e)(9), Nov. 2, 2002, 116 Stat. 1810; Pub. L. 114–153, § 2(a), (d)(1), May 11, 2016, 130 Stat. 376, 381.)

## 18 U.S. Code § 1839 - Definitions

As used in this chapter—

(1) the term "foreign instrumentality" means any agency, bureau, ministry, component, institution, association, or any legal, commercial, or business organization, corporation, firm, or entity that is substantially owned, controlled, sponsored, commanded, managed, or dominated by a foreign government;

(2) the term "foreign agent" means any officer, employee, proxy, servant, delegate, or representative of a foreign government;

(3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—

(A) the owner thereof has taken reasonable measures to keep such information secret; and

(B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

ADD-9

(4) the term "owner", with respect to a trade secret, means the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed;

(5) the term "misappropriation" means—

(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(B) disclosure or use of a trade secret of another without express or implied consent by a person who—

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(iii) before a material change of the position of the person, knew or had reason to know that—

(I) the trade secret was a trade secret; and

(II) knowledge of the trade secret had been acquired by accident or mistake;

(6) the term "improper means"—

(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and

**ADD-10**

(B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition; and

(7) the term "Trademark Act of 1946" means the Act entitled "An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes [1], approved July 5, 1946 (15 U.S.C. 1051 et seq.) (commonly referred to as the 'Trademark Act of 1946' or the 'Lanham Act')" [1].

(Added Pub. L. 104–294, title I, § 101(a), Oct. 11, 1996, 110 Stat. 3490; amended Pub. L. 114–153, § 2(b), May 11, 2016, 130 Stat. 380.)


**Business and Professions Code – BPC**
**DIVISION 7. GENERAL BUSINESS REGULATIONS [16000 - 18107]**
*(Division 7 added by Stats. 1941, Ch. 61.)*
**PART 2. PRESERVATION AND REGULATION OF COMPETITION [16600 - 17365]** *(Part 2 added by Stats. 1941, Ch. 526.)*

**CHAPTER 5. Enforcement [17200 - 17210]** *(Chapter 5 added by Stats. 1977, Ch. 299.)*


**17200.** As used in this chapter, unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code.

*(Amended by Stats. 1992, Ch. 430, Sec. 2. Effective January 1, 1993.)*

**17201.** As used in this chapter, the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons.

*(Added by Stats. 1977, Ch. 299.)*

**17201.5.** As used in this chapter:

(a) "Board within the Department of Consumer Affairs" includes any commission, bureau, division, or other similarly constituted agency within the Department of Consumer Affairs.

(b) "Local consumer affairs agency" means and includes any city or county body which primarily provides consumer protection services.

*(Added by Stats. 1979, Ch. 897.)*

**17202.** Notwithstanding Section 3369 of the Civil Code, specific or preventive relief may be granted to enforce a penalty, forfeiture, or penal law in a case of unfair competition.

*(Added by Stats. 1977, Ch. 299.)*

**17203.** Injunctive Relief—Court Orders

Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition. Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure, but these limitations do not apply to claims brought under this chapter by the Attorney General, or any district attorney, county counsel, city attorney, or city prosecutor in this state.

*(Amended November 2, 2004, by initiative Proposition 64, Sec. 2.)*

**17204.** Actions for Injunctions by Attorney General, District Attorney, County Counsel, and City Attorneys

Actions for relief pursuant to this chapter shall be prosecuted exclusively in a court of competent jurisdiction by the Attorney General or a district attorney or by a county counsel authorized by agreement with the district attorney in actions

**ADD-12**

involving violation of a county ordinance, or by a city attorney of a city having a population in excess of 750,000, or by a county counsel of any county within which a city has a population in excess of 750,000, or by a city attorney in a city and county or, with the consent of the district attorney, by a city prosecutor in a city having a full-time city prosecutor in the name of the people of the State of California upon their own complaint or upon the complaint of a board, officer, person, corporation, or association, or by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition.

*(Amended by Stats. 2021, Ch. 140, Sec. 1. (SB 461) Effective January 1, 2022. Note: This section was amended on Nov. 2, 2004, by initiative Prop. 64.)*

**17205.** Unless otherwise expressly provided, the remedies or penalties provided by this chapter are cumulative to each other and to the remedies or penalties available under all other laws of this state.

*(Added by Stats. 1977, Ch. 299.)*

**17206.** Civil Penalty for Violation of Chapter

(a) Any person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which shall be assessed and recovered in a civil action brought in the name of the people of the State of California by the Attorney General, by any district attorney, by any county counsel authorized by agreement with the district attorney in actions involving violation of a county ordinance, by any city attorney of a city having a population in excess of 750,000, or by a county counsel of any county within which a city has a population in excess of 750,000, by any city attorney of any city and county, or, with the consent of the district attorney, by a city prosecutor in any city having a full-time city prosecutor, in any court of competent jurisdiction.

(b) The court shall impose a civil penalty for each violation of this chapter. In assessing the amount of the civil penalty, the court shall consider any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over

which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth.

(c) (1) If the action is brought by the Attorney General, one-half of the penalty collected shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the General Fund.

(2) If the action is brought by a district attorney or county counsel, the penalty collected shall be paid to the treasurer of the county in which the judgment was entered.

(3) (A) Except as provided in subparagraph (B) and subdivision (e), if the action is brought by a city attorney or city prosecutor, one-half of the penalty collected shall be paid to the treasurer of the city in which the judgment was entered, and one-half to the treasurer of the county in which the judgment was entered.

(B) If the action is brought by the City Attorney of San Diego, the penalty collected shall be paid to the treasurer of the City of San Diego.

(4) The aforementioned funds shall be for the exclusive use by the Attorney General, the district attorney, the county counsel, and the city attorney for the enforcement of consumer protection laws.

(d) The Unfair Competition Law Fund is hereby created as a special account within the General Fund in the State Treasury. The portion of penalties that is payable to the General Fund or to the Treasurer recovered by the Attorney General from an action or settlement of a claim made by the Attorney General pursuant to this chapter or Chapter 1 (commencing with Section 17500) of Part 3 shall be deposited into this fund. Moneys in this fund, upon appropriation by the Legislature, shall be used by the Attorney General to support investigations and prosecutions of California's consumer protection laws, including implementation of judgments obtained from such prosecutions or investigations and other activities which are in furtherance of this chapter or Chapter 1 (commencing with Section 17500) of Part 3. Notwithstanding Section 13340 of the Government Code, any civil penalties deposited in the fund pursuant to the National Mortgage Settlement, as provided in Section 12531 of the Government Code, are continuously appropriated to the

**ADD-14**

Department of Justice for the purpose of offsetting General Fund costs incurred by the Department of Justice.

(e) If the action is brought at the request of a board within the Department of Consumer Affairs or a local consumer affairs agency, the court shall determine the reasonable expenses incurred by the board or local agency in the investigation and prosecution of the action.

Before any penalty collected is paid out pursuant to subdivision (c), the amount of any reasonable expenses incurred by the board shall be paid to the Treasurer for deposit in the special fund of the board described in Section 205. If the board has no such special fund, the moneys shall be paid to the Treasurer. The amount of any reasonable expenses incurred by a local consumer affairs agency shall be paid to the general fund of the municipality or county that funds the local agency.

(f) If the action is brought by a city attorney of a city and county, the entire amount of the penalty collected shall be paid to the treasurer of the city and county in which the judgment was entered for the exclusive use by the city attorney for the enforcement of consumer protection laws. However, if the action is brought by a city attorney of a city and county for the purposes of civil enforcement pursuant to Section 17980 of the Health and Safety Code or Article 3 (commencing with Section 11570) of Chapter 10 of Division 10 of the Health and Safety Code, either the penalty collected shall be paid entirely to the treasurer of the city and county in which the judgment was entered or, upon the request of the city attorney, the court may order that up to one-half of the penalty, under court supervision and approval, be paid for the purpose of restoring, maintaining, or enhancing the premises that were the subject of the action, and that the balance of the penalty be paid to the treasurer of the city and county.

*(Amended by Stats. 2021, Ch. 140, Sec. 2. (SB 461) Effective January 1, 2022. Note: This section was amended on Nov. 2, 2004, by initiative Prop. 64.)*

**17206.1.** (a) (1) In addition to any liability for a civil penalty pursuant to Section 17206, a person who violates this chapter, and the act or acts of unfair competition are perpetrated against one or more senior citizens or disabled persons, may be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500)

for each violation, which may be assessed and recovered in a civil action as prescribed in Section 17206.

(2) Subject to subdivision (d), any civil penalty shall be paid as prescribed by subdivisions (b) and (c) of Section 17206.

(b) As used in this section, the following terms have the following meanings:

(1) "Senior citizen" means a person who is 65 years of age or older.

(2) "Disabled person" means a person who has a physical or mental impairment that substantially limits one or more major life activities.

(A) As used in this subdivision, "physical or mental impairment" means any of the following:

(i) A physiological disorder or condition, cosmetic disfigurement, or anatomical loss substantially affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; or endocrine.

(ii) A mental or psychological disorder, including intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

"Physical or mental impairment" includes, but is not limited to, diseases and conditions including orthopedic, visual, speech, and hearing impairment, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, intellectual disability, and emotional illness.

(B) "Major life activities" means functions that include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

(c) In determining whether to impose a civil penalty pursuant to subdivision (a) and the amount thereof, the court shall consider, in addition to any other appropriate factors, the extent to which one or more of the following factors are present:

(1) Whether the defendant knew or should have known that his or her conduct was directed to one or more senior citizens or disabled persons.

(2) Whether the defendant's conduct caused one or more senior citizens or disabled persons to suffer any of the following: loss or encumbrance of a primary residence, principal employment, or source of income; substantial loss of property set aside for retirement, or for personal or family care and maintenance; or substantial loss of payments received under a pension or retirement plan or a government benefits program, or assets essential to the health or welfare of the senior citizen or disabled person.

(3) Whether one or more senior citizens or disabled persons are substantially more vulnerable than other members of the public to the defendant's conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and actually suffered substantial physical, emotional, or economic damage resulting from the defendant's conduct.

(d) A court of competent jurisdiction hearing an action pursuant to this section may make orders and judgments as necessary to restore to a senior citizen or disabled person money or property, real or personal that may have been acquired by means of a violation of this chapter. Restitution ordered pursuant to this subdivision shall be given priority over recovery of a civil penalty designated by the court as imposed pursuant to subdivision (a), but shall not be given priority over a civil penalty imposed pursuant to subdivision (a) of Section 17206. If the court determines that full restitution cannot be made to those senior citizens or disabled persons, either at the time of judgment or by a future date determined by the court, then restitution under this subdivision shall be made on a pro rata basis depending on the amount of loss.

*(Amended by Stats. 2012, Ch. 457, Sec. 3. (SB 1381) Effective January 1, 2013.)*

**17206.2.** (a) (1) In addition to any liability for a civil penalty pursuant to Section 17206, a person who violates this chapter, if the act or acts of unfair competition are perpetrated against one or more service members or veterans, may be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500) for each violation, which may be assessed and recovered in a civil action as prescribed in Section 17206.

**ADD-17**

(2) Any civil penalty shall be paid as prescribed by subdivisions (b) and (c) of Section 17206.

(b) As used in this section, the following terms have the following meanings:

(1) "Service member" means a person who is a member of the Army, Navy, Air Force, Marine Corps, Space Force, or Coast Guard, or the active militia of this state.

(2) "Veteran" means a person who was formerly a service member.

*(Added by Stats. 2022, Ch. 620, Sec. 2. (SB 1311) Effective January 1, 2023.)*

**17207.** (a) Any person who intentionally violates any injunction prohibiting unfair competition issued pursuant to Section 17203 shall be liable for a civil penalty not to exceed six thousand dollars ($6,000) for each violation. Where the conduct constituting a violation is of a continuing nature, each day of that conduct is a separate and distinct violation. In determining the amount of the civil penalty, the court shall consider all relevant circumstances, including, but not limited to, the extent of the harm caused by the conduct constituting a violation, the nature and persistence of that conduct, the length of time over which the conduct occurred, the assets, liabilities, and net worth of the person, whether corporate or individual, and any corrective action taken by the defendant.

(b) The civil penalty prescribed by this section shall be assessed and recovered in a civil action brought in any county in which the violation occurs or where the injunction was issued in the name of the people of the State of California by the Attorney General or by any district attorney, any county counsel of any county within which a city has a population in excess of 750,000 or any county counsel that is authorized by agreement with the district attorney in actions involving violation of a county ordinance, or any city attorney in any court of competent jurisdiction within the attorney's jurisdiction without regard to the county from which the original injunction was issued. An action brought pursuant to this section to recover civil penalties shall take precedence over all civil matters on the calendar of the court except those matters to which equal precedence on the calendar is granted by law.

(c) If such an action is brought by the Attorney General, one-half of the penalty collected pursuant to this section shall be paid to the treasurer of the county in which the judgment was entered, and one-half to the State Treasurer. If brought by a district attorney or county counsel the entire amount of the penalty collected shall be paid to the treasurer of the county in which the judgment is entered. If brought by a city attorney or city prosecutor, one-half of the penalty shall be paid to the treasurer of the county in which the judgment was entered and one-half to the city, except that if the action was brought by a city attorney of a city and county the entire amount of the penalty collected shall be paid to the treasurer of the city and county in which the judgment is entered.

(d) If the action is brought at the request of a board within the Department of Consumer Affairs or a local consumer affairs agency, the court shall determine the reasonable expenses incurred by the board or local agency in the investigation and prosecution of the action.

Before any penalty collected is paid out pursuant to subdivision (c), the amount of the reasonable expenses incurred by the board shall be paid to the State Treasurer for deposit in the special fund of the board described in Section 205. If the board has no such special fund, the moneys shall be paid to the State Treasurer. The amount of the reasonable expenses incurred by a local consumer affairs agency shall be paid to the general fund of the municipality or county which funds the local agency.

*(Amended by Stats. 2021, Ch. 140, Sec. 3. (SB 461) Effective January 1, 2022.)*

**17208.** Any action to enforce any cause of action pursuant to this chapter shall be commenced within four years after the cause of action accrued. No cause of action barred under existing law on the effective date of this section shall be revived by its enactment.

*(Added by Stats. 1977, Ch. 299.)*

**17209.** If a violation of this chapter is alleged or the application or construction of this chapter is in issue in any proceeding in the Supreme Court of California, a state court of appeal, or the appellate division of a superior court, each person filing any brief or petition with the court in that proceeding shall serve, within three days of filing with the court, a copy of that brief or petition on the Attorney

General, directed to the attention of the Consumer Protection Section at a service address designated on the Attorney General's official internet website for service of papers under this section or, if no service address is designated, at the Attorney General's office in the City of San Francisco and on the district attorney of the county in which the lower court action or proceeding was originally filed. Upon the Attorney General's or district attorney's request, each person who has filed any other document, including all or a portion of the appellate record, with the court in addition to a brief or petition shall provide a copy of that document without charge to the Attorney General or the district attorney within five days of the request. The time for service may be extended by the Chief Justice or presiding justice or judge for good cause shown. No judgment or relief, temporary or permanent, shall be granted or opinion issued until proof of service of the brief or petition on the Attorney General and district attorney is filed with the court.

*(Amended by Stats. 2024, Ch. 853, Sec. 1. (AB 3281) Effective January 1, 2025.)*

**17210.** (a) For purposes of this section, "hotel" means any hotel, motel, bed and breakfast inn, or other similar transient lodging establishment, but it does not include any residential hotel as defined in Section 50519 of the Health and Safety Code. "Innkeeper" means the owner or operator of a hotel, or the duly authorized agent or employee of the owner or operator.

(b) For purposes of this section, "handbill" means, and is specifically limited to, any tangible commercial solicitation to guests of the hotel urging that they patronize any commercial enterprise.

(c) Every person (hereinafter "distributor") engages in unfair competition for purposes of this chapter who deposits, places, throws, scatters, casts, or otherwise distributes any handbill to any individual guest rooms in any hotel, including, but not limited to, placing, throwing, leaving, or attaching any handbill adjacent to, upon, or underneath any guest room door, doorknob, or guest room entryway, where either the innkeeper has expressed objection to handbill distribution, either orally to the distributor or by the posting of a sign or other notice in a conspicuous place within the lobby area and at all points of access from the exterior of the premises to guest room areas indicating that handbill distribution is prohibited, or the distributor has received written notice pursuant to subdivision (e) that the

innkeeper has expressed objection to the distribution of handbills to guest rooms in the hotel.

(d) Every person (hereinafter "contractor") engages in unfair competition for purposes of this chapter who causes or directs any other person, firm, business, or entity to distribute, or cause the distribution of, any handbill to any individual guest rooms in any hotel in violation of subdivision (c) of this section, if the contractor has received written notice from the innkeeper objecting to the distribution of handbills to individual guest rooms in the hotel.

(e) Every contractor who causes or directs any distributor to distribute, or cause the distribution of, any handbills to any individual guest rooms in any hotel, if the contractor has received written notice from the innkeeper or from any other contractor or intermediary pursuant to this subdivision, objecting to the distribution of handbills to individual guest rooms in the hotel has failed to provide a written copy of that notice to each distributor prior to the commencement of distribution of handbills by the distributor or by any person hired or retained by the distributor for that purpose, or, within 24 hours following the receipt of the notice by the contractor if received after the commencement of distribution, and has failed to instruct and demand any distributor to not distribute, or to cease the distribution of, the handbills to individual guest rooms in any hotel for which such a notice has been received is in violation of this section.

(f) Any written notice given, or caused to be given, by the innkeeper pursuant to or required by any provision of this section shall be deemed to be in full force and effect until such time as the notice is revoked in writing.

(g) Nothing in this section shall be deemed to prohibit the distribution of a handbill to guest rooms in any hotel where the distribution has been requested or approved in writing by the innkeeper, or to any individual guest room when the occupant thereof has affirmatively requested or approved the distribution of the handbill during the duration of the guest's occupancy.

*(Added by Stats. 1999, Ch. 354, Sec. 1. Effective January 1, 2000.)*

**ADD-21**

**2010 California Code Civil Code**
**Title 5. Uniform Trade Secrets Act**

**CIVIL CODE SECTION 3426-3426.11**

**3426.** This title may be cited as the Uniform Trade Secrets Act.

**3426.1.** As used in this title, unless the context requires otherwise:

(a) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means. Reverse engineering or independent derivation alone shall not be considered improper means.

(b) "Misappropriation" means:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

**ADD-22**

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

(c) "Person" means a natural person, corporation, business trust, estate, trust, partnership, limited liability company, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.

(d) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.


**3426.2.** (a) Actual or threatened misappropriation may be enjoined. Upon application to the court, an injunction shall be terminated when the trade secret has ceased to exist, but the injunction may be continued for an additional period of time in order to eliminate commercial advantage that otherwise would be derived from the misappropriation.

(b) If the court determines that it would be unreasonable to prohibit future use, an injunction may condition future use upon payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(c) In appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order.

**3426.3.** (a) A complainant may recover damages for the actual loss caused by misappropriation. A complainant also may recover for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.

(b) If neither damages nor unjust enrichment caused by misappropriation are provable, the court may order payment of a reasonable royalty for no longer than the period of time the use could have been prohibited.

(c) If willful and malicious misappropriation exists, the court may award exemplary damages in an amount not exceeding twice any award made under subdivision (a) or (b).

**3426.4.** If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exists, the court may award reasonable attorney's fees and costs to the prevailing party. Recoverable costs hereunder shall include a reasonable sum to cover

**ADD-24**

the services of expert witnesses, who are not regular employees of any party, actually incurred and reasonably necessary in either, or both, preparation for trial or arbitration, or during trial or arbitration, of the case by the prevailing party.

**3426.5.** In an action under this title, a court shall preserve the secrecy of an alleged trade secret by reasonable means, which may include granting protective orders in connection with discovery proceedings, holding in-camera hearings, sealing the records of the action, and ordering any person involved in the litigation not to disclose an alleged trade secret without prior court approval.

**3426.6.** An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered. For the purposes of this section, a continuing misappropriation constitutes a single claim.

**3426.7.** (a) Except as otherwise expressly provided, this title does not supersede any statute relating to misappropriation of a trade secret, or any statute otherwise regulating trade secrets.

(b) This title does not affect (1) contractual remedies, whether or not based upon misappropriation of a trade secret, (2) other civil remedies that are not based upon misappropriation of a trade secret,

**ADD-25**

or (3) criminal remedies, whether or not based upon misappropriation of a trade secret.

  (c) This title does not affect the disclosure of a record by a state or local agency under the California Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code). Any determination as to whether the disclosure of a record under the California Public Records Act constitutes a misappropriation of a trade secret and the rights and remedies with respect thereto shall be made pursuant to the law in effect before the operative date of this title.

**3426.8.** This title shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this title among states enacting it.

**3426.9.** If any provision of this title or its application to any person or circumstances is held invalid, the invalidity does not affect other provisions or applications of the title which can be given effect without the invalid provision or application, and to this end the provisions of this title are severable.

**3426.10.** This title does not apply to misappropriation occurring prior to January 1, 1985. If a continuing misappropriation otherwise covered by this title began before January 1, 1985, this title does

**ADD-26**

not apply to the part of the misappropriation occurring before that date. This title does apply to the part of the misappropriation occurring on or after that date unless the appropriation was not a misappropriation under the law in effect before the operative date of this title.

**3426.11.** Notwithstanding subdivision (b) of Section 47, in any legislative or judicial proceeding, or in any other official proceeding authorized by law, or in the initiation or course of any other proceeding authorized by law and reviewable pursuant to Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure, the voluntary, intentional disclosure of trade secret information, unauthorized by its owner, to a competitor or potential competitor of the owner of the trade secret information or the agent or representative of such a competitor or potential competitor is not privileged and is not a privileged communication for purposes of Part 2 (commencing with Section 43) of Division 1.

This section does not in any manner limit, restrict, impair, or otherwise modify either the application of the other subdivisions of Section 47 to the conduct to which this section applies or the court's authority to control, order, or permit access to evidence in any case before it.

Nothing in this section shall be construed to limit, restrict, or otherwise impair, the capacity of persons employed by public entities

**ADD-27**

to report improper government activity, as defined in Section 10542
of the Government Code, or the capacity of private persons to report
improper activities of a private business.

**Federal Rules of Civil Procedure Rule 15. Amended and Supplemental Pleadings**

(a) Amendments Before Trial.

(1) *Amending as a Matter of Course.* A party may amend its pleading once as a matter of course no later than:

(A) 21 days after serving it, or

(B) if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier.

(2) *Other Amendments.* In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires.

(3) *Time to Respond.* Unless the court orders otherwise, any required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later.

(b) Amendments During and After Trial.

(1) *Based on an Objection at Trial.* If, at trial, a party objects that evidence is not within the issues raised in the pleadings, the court may permit the pleadings to be amended. The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits. The court may grant a continuance to enable the objecting party to meet the evidence.

**ADD-28**

(2) *For Issues Tried by Consent.* When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

(c) Relation Back of Amendments.

(1) *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

(2) *Notice to the United States.* When the United States or a United States officer or agency is added as a defendant by amendment, the notice requirements of Rule 15(c)(1)(C)(i) and (ii) are satisfied if, during the stated period, process was delivered or mailed to the United States attorney or the United States attorney's designee, to the Attorney General of the United States, or to the officer or agency.

(d) Supplemental Pleadings. On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any

**ADD-29**

transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

**Notes**

(As amended Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 1991, eff. Dec. 1, 1991; Pub. L. 102–198, §11(a), Dec. 9, 1991, 105 Stat. 1626; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

### Notes of Advisory Committee on Rules—1937

See generally for the present federal practice, [former] Equity Rules 19 (Amendments Generally), 28 (Amendment of Bill as of Course), 32 (Answer to Amended Bill), 34 (Supplemental Pleading), and 35 (Bills of Revivor and Supplemental Bills—Form); U.S.C., Title 28, §§399 [now 1653] (Amendments to show diverse citizenship) and [former] 777 (Defects of Form; amendments). See *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 28, r.r. 1– 13; O. 20, r. 4; O. 24, r.r. 1–3.

*Note to Subdivision (a)*. The right to serve an amended pleading once as of course is common. 4 Mont.Rev.Codes Ann. (1935) §9186; 1 Ore.Code Ann. (1930) §1–904; 1 S.C.Code (Michie, 1932) §493; *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 28, r. 2. Provision for amendment of pleading before trial, by leave of court, is in almost every code. If there is no statute the power of the court to grant leave is said to be inherent. Clark, *Code Pleading*, (1928) pp. 498, 509.

*Note to Subdivision (b)*. Compare [former] Equity Rule 19 (Amendments Generally) and code provisions which allow an amendment "at any time in furtherance of justice," (e. g., Ark.Civ.Code (Crawford, 1934) §155) and which allow an amendment of pleadings to conform to the evidence, where the adverse party has not been misled and prejudiced (e.g., N.M.Stat.Ann. (Courtright, 1929) §§105–601, 105–602).

**ADD-30**

*Note to Subdivision (c)*. "Relation back" is a well recognized doctrine of recent and now more frequent application. Compare Ala.Code Ann. (Michie, 1928) §9513; Ill.Rev.Stat. (1937) ch. 110, §170(2); 2 Wash.Rev.Stat.Ann. (Remington, 1932) §308–3(4). See U.S.C., Title 28, §399 [now 1653] (Amendments to show diverse citizenship) for a provision for "relation back."

*Note to Subdivision (d)*. This is an adaptation of Equity Rule 34 (Supplemental Pleading).

### Notes of Advisory Committee on Rules—1963 Amendment

Rule 15(d) is intended to give the court broad discretion in allowing a supplemental pleading. However, some cases, opposed by other cases and criticized by the commentators, have taken the rigid and formalistic view that where the original complaint fails to state a claim upon which relief can be granted, leave to serve a supplemental complaint must be denied. See *Bonner v. Elizabeth Arden, Inc.*, 177 F.2d 703 (2d Cir. 1949); *Bowles v. Senderowitz*, 65 F.Supp. 548 (E.D.Pa.), rev'd on other grounds, 158 F.2d 435 (3d Cir. 1946), cert. denied, *Senderowitz v. Fleming*, 330 U.S. 848, 67 S.Ct. 1091, 91 L.Ed. 1292 (1947); cf. *LaSalle Nat. Bank v. 222 East Chestnut St. Corp.*, 267 F.2d 247 (7th Cir.), cert. denied, 361 U.S. 836, 80 S.Ct. 88, 4 L.Ed.2d 77 (1959). But see *Camilla Cotton Oil Co. v. Spencer Kellogg & Sons*, 257 F.2d 162 (5th Cir. 1958); *Genuth v. National Biscuit Co.*, 81 F.Supp. 213 (S.D.N.Y. 1948), app. dism., 177 F.2d 962 (2d Cir. 1949); 3 *Moore's Federal Practice* 15.01 [5] (Supp. 1960); 1A Barron & Holtzoff, *Federal Practice & Procedure* 820–21 (Wright ed. 1960). Thus plaintiffs have sometimes been needlessly remitted to the difficulties of commencing a new action even though events occurring after the commencement of the original action have made clear the right to relief.

Under the amendment the court has discretion to permit a supplemental pleading despite the fact that the original pleading is defective. As in other situations where a supplemental pleading is offered, the court is to determine in the light of the particular circumstances whether filing should be permitted, and if so, upon what terms. The amendment does not attempt to deal with such questions as the relation of the statute of limitations to supplemental pleadings, the operation of the doctrine of laches, or the availability of other defenses. All these questions are for decision in accordance with the principles applicable to supplemental pleadings

generally. Cf. *Blau v. Lamb*, 191 F.Supp. 906 (S.D.N.Y. 1961); *Lendonsol Amusement Corp. v. B. & Q. Assoc., Inc*., 23 F.R.Serv. 15d. 3, Case 1 (D.Mass. 1957).

### Notes of Advisory Committee on Rules—1966 Amendment

Rule 15(c) is amplified to state more clearly when an amendment of a pleading changing the party against whom a claim is asserted (including an amendment to correct a misnomer or misdescription of a defendant) shall "relate back" to the date of the original pleading.

The problem has arisen most acutely in certain actions by private parties against officers or agencies of the United States. Thus an individual denied social security benefits by the Secretary of Health, Education, and Welfare may secure review of the decision by bringing a civil action against that officer within sixty days. 42 U.S.C. §405(g) (Supp. III, 1962). In several recent cases the claimants instituted timely action but mistakenly named as defendant the United States, the Department of HEW, the "Federal Security Administration" (a nonexistent agency), and a Secretary who had retired from the office nineteen days before. Discovering their mistakes, the claimants moved to amend their complaints to name the proper defendant; by this time the statutory sixty-day period had expired. The motions were denied on the ground that the amendment "would amount to the commencement of a new proceeding and would not relate back in time so as to avoid the statutory provision * * * that suit be brought within sixty days * * *" *Cohn v. Federal Security Adm*., 199 F.Supp. 884, 885 (W.D.N.Y. 1961); see also *Cunningham v. United States*, 199 F.Supp. 541 (W.D.Mo. 1958); *Hall v. Department of HEW*, 199 F.Supp. 833 (S.D.Tex. 1960); *Sandridge v. Folsom, Secretary of HEW*, 200 F.Supp. 25 (M.D.Tenn. 1959). [The Secretary of Health, Education, and Welfare has approved certain ameliorative regulations under 42 U.S.C. §405(g). See 29 Fed.Reg. 8209 (June 30, 1964); Jacoby, The Effect of Recent Changes in the Law of "Nonstatutory" Judicial Review, 53 Geo.L.J. 19, 42–43 (1964); see also *Simmons v. United States Dept. HEW*, 328 F.2d 86 (3d Cir. 1964).]

Analysis in terms of "new proceeding" is traceable to *Davis v. L. L. Cohen & Co*., 268 U.S. 638 (1925), and *Mellon v. Arkansas Land & Lumber Co*., 275 U.S. 460 (1928), but those cases antedate the adoption of the Rules which import

**ADD-32**

different criteria for determining when an amendment is to "relate back". As lower courts have continued to rely on the *Davis* and *Mellon* cases despite the contrary intent of the Rules, clarification of Rule 15(c) is considered advisable.

Relation back is intimately connected with the policy of the statute of limitations. The policy of the statute limiting the time for suit against the Secretary of HEW would not have been offended by allowing relation back in the situations described above. For the government was put on notice of the claim within the stated period—in the particular instances, by means of the initial delivery of process to a responsible government official (see Rule 4(d)(4) and (5). In these circumstances, characterization of the amendment as a new proceeding is not responsive to the reality, but is merely question-begging; and to deny relation back is to defeat unjustly the claimant's opportunity to prove his case. See the full discussion by Byse, *Suing the "Wrong" Defendant in Judicial Review of Federal Administrative Action: Proposals for Reform*, 77 Harv.L.Rev. 40 (1963); see also Ill.Civ.P.Act §46(4).

Much the same question arises in other types of actions against the government (see *Byse*, supra, at 45 n. 15). In actions between private parties, the problem of relation back of amendments changing defendants has generally been better handled by the courts, but incorrect criteria have sometimes been applied, leading sporadically to doubtful results. See 1A Barron & Holtzoff, *Federal Practice & Procedure* §451 (Wright ed. 1960); 1 id. §186 (1960); 2 id. §543 (1961); 3 *Moore's Federal Practice*, par. 15.15 (Cum.Supp. 1962); Annot., *Change in Party After Statute of Limitations Has Run*, 8 A.L.R.2d 6 (1949). Rule 15(c) has been amplified to provide a general solution. An amendment changing the party against whom a claim is asserted relates back if the amendment satisfies the usual condition of Rule 15(c) of "arising out of the conduct * * * set forth * * * in the original pleading," and if, within the applicable limitations period, the party brought in by amendment, first, received such notice of the institution of the action—the notice need not be formal—that he would not be prejudiced in defending the action, and, second, knew or should have known that the action would have been brought against him initially had there not been a mistake concerning the identity of the proper party. Revised Rule 15(c) goes on to provide specifically in the government cases that the first and second requirements are satisfied when the government has been notified in the manner there described (see

Rule 4(d)(4) and (5). As applied to the government cases, revised Rule 15(c) further advances the objectives of the 1961 amendment of Rule 25(d) (substitution of public officers).

The relation back of amendments changing plaintiffs is not expressly treated in revised Rule 15(c) since the problem is generally easier. Again the chief consideration of policy is that of the statute of limitations, and the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs. Also relevant is the amendment of Rule 17(a) (real party in interest). To avoid forfeitures of just claims, revised Rule 17(a) would provide that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed for correction of the defect in the manner there stated.

### Notes of Advisory Committee on Rules—1987 Amendment

The amendments are technical. No substantive change is intended.

### Notes of Advisory Committee on Rules—1991 Amendment

The rule has been revised to prevent parties against whom claims are made from taking unjust advantage of otherwise inconsequential pleading errors to sustain a limitations defense.

*Paragraph (c)(1)*. This provision is new. It is intended to make it clear that the rule does not apply to preclude any relation back that may be permitted under the applicable limitations law. Generally, the applicable limitations law will be state law. If federal jurisdiction is based on the citizenship of the parties, the primary reference is the law of the state in which the district court sits. *Walker v. Armco Steel Corp.*, 446 U.S. 740 (1980). If federal jurisdiction is based on a federal question, the reference may be to the law of the state governing relations between the parties. *E.g., Board of Regents v. Tomanio*, 446 U.S. 478 (1980). In some circumstances, the controlling limitations law may be federal law. *E.g., West v. Conrail, Inc.*, 107 S.Ct. 1538 (1987). Cf. *Burlington Northern R. Co. v. Woods*, 480 U.S. 1 (1987); *Stewart Organization v. Ricoh*, 108 S.Ct. 2239 (1988). Whatever may be the controlling body of limitations law, if that law affords a more forgiving principle of relation back than the one provided in this rule, it should be available to save the claim. Accord, *Marshall v. Mulrenin*, 508 F.2d 39 (1st cir.

**ADD-34**

1974). If *Schiavone v. Fortune*, 106 S.Ct. 2379 (1986) implies the contrary, this paragraph is intended to make a material change in the rule.

*Paragraph (c)(3)*. This paragraph has been revised to change the result in *Schiavone v. Fortune, supra*, with respect to the problem of a misnamed defendant. An intended defendant who is notified of an action within the period allowed by Rule 4(m) for service of a summons and complaint may not under the revised rule defeat the action on account of a defect in the pleading with respect to the defendant's name, provided that the requirements of clauses (A) and (B) have been met. If the notice requirement is met within the Rule 4(m) period, a complaint may be amended at any time to correct a formal defect such as a misnomer or misidentification. On the basis of the text of the former rule, the Court reached a result in *Schiavone v. Fortune* that was inconsistent with the liberal pleading practices secured by Rule 8. See Bauer, Schiavone: *An Un-Fortune-ate Illustration of the Supreme Court's Role as Interpreter of the Federal Rules of Civil Procedure*, 63 NOTRE DAME L. REV. 720 (1988); Brussack, *Outrageous Fortune: The Case for Amending Rule 15(c) Again*, 61 S. CAL. L. REV. 671 (1988); Lewis, *The Excessive History of Federal Rule 15(c) and Its Lessons for Civil Rules Revision*, 86 MICH. L. REV. 1507 (1987).

In allowing a name-correcting amendment within the time allowed by Rule 4(m), this rule allows not only the 120 days specified in that rule, but also any additional time resulting from any extension ordered by the court pursuant to that rule, as may be granted, for example, if the defendant is a fugitive from service of the summons.

This revision, together with the revision of Rule 4(i) with respect to the failure of a plaintiff in an action against the United States to effect timely service on all the appropriate officials, is intended to produce results contrary to those reached in *Gardner v. Gartman*, 880 F.2d 797 (4th cir. 1989), *Rys v. U.S. Postal Service*, 886 F.2d 443 (1st cir. 1989), *Martin's Food & Liquor, Inc. v. U.S. Dept. of Agriculture*, 14 F.R.S.3d 86 (N.D. Ill. 1988). *But cf. Montgomery v. United States Postal Service*, 867 F.2d 900 (5th cir. 1989), *Warren v. Department of the Army*, 867 F.2d 1156 (8th cir. 1989); *Miles v. Department of the Army*, 881 F.2d 777 (9th cir. 1989), *Barsten v. Department of the Interior*, 896 F.2d 422 (9th cir. 1990); *Brown v. Georgia Dept. of Revenue*, 881 F.2d 1018 (11th cir. 1989).

**ADD-35**

### Congressional Modification of Proposed 1991 Amendment

Section 11(a) of Pub. L. 102–198 [set out as a note under section 2074 of this title] provided that Rule 15(c)(3) of the Federal Rules of Civil Procedure as transmitted to Congress by the Supreme Court to become effective on Dec. 1, 1991, is amended. See 1991 Amendment note below.

### Notes of Advisory Committee on Rules—1993 Amendment

The amendment conforms the cross reference to Rule 4 to the revision of that rule.

### Committee Notes on Rules—2007 Amendment

The language of Rule 15 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Former Rule 15(c)(3)(A) called for notice of the "institution" of the action. Rule 15(c)(1)(C)(i) omits the reference to "institution" as potentially confusing. What counts is that the party to be brought in have notice of the existence of the action, whether or not the notice includes details as to its "institution."

### Committee Notes on Rules—2009 Amendment

Rule 15(a)(1) is amended to make three changes in the time allowed to make one amendment as a matter of course.

Former Rule 15(a) addressed amendment of a pleading to which a responsive pleading is required by distinguishing between the means used to challenge the pleading. Serving a responsive pleading terminated the right to amend. Serving a motion attacking the pleading did not terminate the right to amend, because a motion is not a "pleading" as defined in Rule 7. The right to amend survived beyond decision of the motion unless the decision expressly cut off the right to amend.

The distinction drawn in former Rule 15(a) is changed in two ways. First, the right to amend once as a matter of course terminates 21 days after service of a motion under Rule 12(b), (e), or (f). This provision will force the pleader to

**ADD-36**

consider carefully and promptly the wisdom of amending to meet the arguments in the motion. A responsive amendment may avoid the need to decide the motion or reduce the number of issues to be decided, and will expedite determination of issues that otherwise might be raised seriatim. It also should advance other pretrial proceedings.

Second, the right to amend once as a matter of course is no longer terminated by service of a responsive pleading. The responsive pleading may point out issues that the original pleader had not considered and persuade the pleader that amendment is wise. Just as amendment was permitted by former Rule 15(a) in response to a motion, so the amended rule permits one amendment as a matter of course in response to a responsive pleading. The right is subject to the same 21-day limit as the right to amend in response to a motion.

The 21-day periods to amend once as a matter of course after service of a responsive pleading or after service of a designated motion are not cumulative. If a responsive pleading is served after one of the designated motions is served, for example, there is no new 21-day period.

Finally, amended Rule 15(a)(1) extends from 20 to 21 days the period to amend a pleading to which no responsive pleading is allowed and omits the provision that cuts off the right if the action is on the trial calendar. Rule 40 no longer refers to a trial calendar, and many courts have abandoned formal trial calendars. It is more effective to rely on scheduling orders or other pretrial directions to establish time limits for amendment in the few situations that otherwise might allow one amendment as a matter of course at a time that would disrupt trial preparations. Leave to amend still can be sought under Rule 15(a)(2), or at and after trial under Rule 15(b).

Abrogation of Rule 13(f) establishes Rule 15 as the sole rule governing amendment of a pleading to add a counterclaim.

Amended Rule 15(a)(3) extends from 10 to 14 days the period to respond to an amended pleading.

**ADD-37**

## Amendment by Public Law

**1991** —Subd. (c)(3). Pub. L. 102–198 substituted "Rule 4(j)" for "Rule 4(m)".

Committee Notes on Rules—2023

Rule 15(a)(1) is amended to substitute "no later than" for "within" to measure the time allowed to amend once as a matter of course. A literal reading of "within" would lead to an untoward practice if a pleading is one to which a responsive pleading is required and neither a responsive pleading nor one of the Rule 12 motions has been served within 21 days after service of the pleading. Under this reading, the time to amend once as a matter of course lapses 21 days after the pleading is served and is revived only on the later service of a responsive pleading or one of the Rule 12 motions. There is no reason to suspend the right to amend in this way. "No later than" makes it clear that the right to amend continues without interruption until 21 days after the earlier of the events described in Rule 15(a)(1)(B).